Argued and submitted January 11, 2002, sentence of death vacated, case remanded to the circuit court for further proceedings March 4, 2004

## STATE OF OREGON,
*Plaintiff on Review,*

*v.*

## RANDY LEE GUZEK,
*Defendant on Review.*

(CC 87-CR-0373-TM; SC S45272)

86 P3d 1106

J. Kevin Hunt, Oregon City, argued the cause for defendant on review. With him on the brief was Eric M. Cumfer, Salem.

Rolf C. Moan, Assistant Attorney General, Salem, argued the cause for plaintiff on review. With him on the briefs were Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, and Robert B. Rocklin and Holly A. Vance, Assistant Attorneys General.

Before Carson, Chief Justice, and Gillette, Durham, Riggs, and De Muniz, Justices.*

RIGGS, J.

Durham, J., concurred and filed an opinion.

Gillette, J., concurred in part and dissented in part and filed an opinion, in which Carson, C. J., joined.

---

* Leeson, J., resigned January 31, 2003, and did not participate in the decision of this case. Balmer and Kistler, JJ., did not participate in the consideration or decision of this case.

**RIGGS, J.**

This case is before us on automatic and direct review of a judgment that imposed a sentence of death for aggravated murder. *Former* ORS 163.150(1)(g) (1997), *repealed by* Or Laws 1999, ch 1055, § 1.[1] This court previously affirmed defendant's conviction of two counts of aggravated murder, *State v. Guzek*, 310 Or 299, 304, 797 P2d 1031 (1990) (*Guzek I*), but twice vacated his sentence of death and remanded for further penalty-phase proceedings, as discussed below. On this third review, the state concedes—and we agree—that the trial court erred in failing to instruct the jury on the "true-life" sentencing option and that this court again must vacate the sentence of death. Accordingly, as discussed further below, we vacate the sentence of death and remand to the trial court for further proceedings. In the discussion that follows, we also address issues of law that are likely to arise on retrial, if the state again pursues a death sentence. *See, e.g.*, *State v. Smith*, 310 Or 1, 21-22, 791 P2d 836 (1990) (addressing issues likely to arise on remand despite already having determined that remand was necessary).

## I. FACTS

The following facts are taken from this court's opinion in *Guzek I*, 310 Or at 301-02, and from the record from defendant's third penalty-phase proceeding. The victims, Rod and Lois Houser, knew defendant because he had been a high school acquaintance of their niece, who lived with them in rural Deschutes County. Defendant and the niece had dated. After the niece ended their relationship, defendant acted with hostility toward her—in her words, "stalk[ing]" her—prompting Rod Houser to warn defendant to stay away from the Housers' home.

In June 1987, defendant and two associates planned to burglarize a particular residence and kill its occupant. When the three men arrived at that residence, however, they were thwarted by the presence of too many people. One of defendant's associates suggested that they target the

---

[1] This court's authority to review sentences of death now is found in ORS 138.012(1).

Housers' home instead. The three men then went to defendant's home, obtained a rifle and a pistol, and went to the Housers' home with the intention of killing the Housers and stealing their property.

When Rod Houser answered defendant's knock at the door, one of defendant's associates, at defendant's prompting, shot Rod Houser repeatedly, killing him. Defendant then found and shot Lois Houser three times, killing her. The three men then ransacked the home and stole a great deal of personal property. The Housers' niece was not at home at the time.

The Housers' two daughters went to their parents' home two days later, worried because they had not been able to reach their parents by telephone. The daughters discovered their parents' bodies inside the ransacked home. Later, the daughters saw and identified their parents' belongings in defendant's possession. As noted, defendant ultimately was convicted of two counts of aggravated murder and sentenced to death.

## II. PROCEDURAL HISTORY

■ Beginning with defendant's first appeal, we describe the procedural history of this case in some detail, because that history provides important background information for much of the discussion that follows. First, we note that, after defendant's first penalty-phase trial, in an unrelated case on remand from the United States Supreme Court, this court concluded that the Eighth Amendment to the United States Constitution[2] requires that a penalty-phase jury consider and answer a general mitigation question, to ensure that the jury has the opportunity to give effect to any mitigating evidence relevant "outside or beyond" particular statutory issues submitted to the jury. *State v. Wagner*, 309 Or 5, 13, 786 P2d 93, *cert den*, 498 US 879 (1990) (*Wagner II*). Because

---

[2] The Eighth Amendment to the United States Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, *nor cruel and unusual punishments inflicted.*" (Emphasis added.) The Eighth Amendment is applicable to the states through the Fourteenth Amendment. *See Robinson v. California*, 370 US 660, 667, 82 S Ct 1417, 8 L Ed 2d 758, *reh'g den*, 371 US 905 (1962) (so demonstrating).

the court in defendant's case had not submitted a general mitigation question to the jury, this court vacated defendant's sentence and remanded the case for a new penalty-phase proceeding. *Guzek I*, 310 Or at 305-06.

The next year, another decision of the United States Supreme Court again affected defendant's penalty-phase proceedings. According to the interpretation of the Eighth Amendment in effect at the time of defendant's crimes, the introduction of "victim-impact" evidence in the penalty phase of a capital trial constituted cruel and unusual punishment under the Eighth Amendment. *See Booth v. Maryland*, 482 US 496, 509, 107 S Ct 2529, 96 L Ed 2d 440, *reh'g den*, 483 US 1056 (1987) (so holding). However, in 1991, the Supreme Court overruled *Booth* in part, concluding that that decision had "deprive[d] the State of the full moral force of its evidence" in a death-penalty case. *Payne v. Tennessee*, 501 US 808, 825, 111 S Ct 2597, 115 L Ed 2d 720, *reh'g den*, 501 US 1277 (1991).[3] The Supreme Court held in *Payne* that the Eighth Amendment did not erect a *per se* bar to victim-impact evidence. *Id.* at 827. In the wake of *Payne*, the state offered, and the trial court admitted, victim-impact evidence against defendant in his second penalty-phase proceeding. Defendant again received a sentence of death.

On review of that second death sentence, defendant argued that the victim-impact evidence that the state had introduced against him was not relevant to any of the questions that the jury was required to consider under the applicable death-penalty statutory scheme, ORS 163.150(1)(b) (1989).[4] This court agreed and remanded the case for further proceedings. *State v. Guzek*, 322 Or 245, 270, 906 P2d 272 (1995) (*Guzek II*).

---

[3] The Supreme Court noted in *Payne* that that case did not involve evidence of the family's opinions about the crime and about the appropriate sentence. 501 US at 830 n 2. Accordingly, the holding in *Booth* that that type of evidence constituted cruel and unusual punishment may remain valid after *Payne*.

[4] In accordance with the statutory framework in place at that time, the trial court asked a general mitigation question in compliance with *Wagner II*. We discuss both the original and current versions of that question, set out at ORS 163.150(1)(b)(D), later in this opinion. *See* 336 Or at 452-54.

After a third penalty-phase proceeding, defendant again was sentenced to death. That sentence is before us now.

## III. TRUE-LIFE SENTENCING OPTION

We turn to the reason for which, as the state concedes, we must vacate defendant's sentence of death.

Defendant's third penalty-phase proceeding began in 1997. The statutes then in effect required the trial court, after this court's remand in *Guzek II* for further penalty-phase proceedings, to sentence defendant to life imprisonment or, at the state's election, to empanel a jury for a new penalty-phase proceeding to determine if defendant should be sentenced to death, to life imprisonment without the possibility of release or parole ("true life"), or to life imprisonment with the possibility of release or parole ("ordinary life"). *Former* ORS 163.150(5)(a)(A), (B) (1997), *renumbered as* ORS 138.012(2)(a)(A), (B) (1999). However, the constitutional protections against *ex post facto* laws contained in Article I, section 21, of the Oregon Constitution and Article I, section 10, of the United States Constitution[5] prohibited retroactive application of the true-life sentencing option to defendant's case, because that option did not exist at the time when defendant committed his crimes. *See State v. Wille*, 317 Or 487, 505, 858 P2d 128 (1993) (retroactive imposition of true-life sentencing option, over the defendant's objection, violates state and federal *ex post facto* prohibitions).

In his third penalty-phase proceeding, defendant moved to have the trial court instruct the jury on the true-life sentencing option. To that end, he expressly waived all *ex post facto* guarantees that otherwise would have protected him from retroactive application of the true-life option. The trial court denied defendant's motion and did not instruct the jury regarding true life.

---

[5] Article I, section 21, of the Oregon Constitution provides, in part, that "[n]o *ex-post facto* law * * * shall ever be passed * * *." Article I, section 10, of the United States Constitution provides, in part, that "[n]o State shall * * * pass any * * * ex post facto Law * * *."

After a jury again sentenced defendant to death, this court explained that a criminal defendant may waive protection from *ex post facto* laws, including the protection against the application of a later-enacted version of the death-penalty statutory scheme. *State v. McDonnell*, 329 Or 375, 388, 987 P2d 486 (1999). This court reiterated those principles in *State v. Langley*, 331 Or 430, 439, 16 P3d 489 (2000). Accordingly, as the state recognizes, the trial court's decision not to instruct the jury regarding the true-life sentencing option was reversible error. We therefore must vacate defendant's sentence of death and remand for further proceedings.

## IV. ISSUES LIKELY TO ARISE ON REMAND

Defendant raises other issues on review. Below, we address some of those issues, which are likely to arise on remand. Specifically, we address (1) the admissibility of "any aggravating evidence" and victim-impact evidence against defendant pursuant to the current versions of ORS 163.150(1)(a) and (c)(B),[6] in light of defendant's state and federal protections against *ex post facto* laws; and (2) the admissibility of certain evidence that the trial court excluded during defendant's third penalty-phase proceeding that defendant again might offer in a subsequent penalty-phase proceeding.

### A. *Admission of "Any Aggravating Evidence" and Victim-Impact Evidence*

At the time of defendant's crimes in 1987, ORS 163.150(1)(a) (1985) required that any evidence introduced in a penalty-phase proceeding must be "relevant to sentence." *Former* ORS 163.150(2) (1985), *renumbered as* ORS 163.150(1)(b)(A) - (C) (1987), in turn, set out three statutory questions for the jury's consideration:

"(a) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

---

[6] Those statutory provisions will govern defendant's penalty-phase proceeding on remand. *See* ORS 138.012(2)(b) (ORS 163.150(1) to (3) and (5) govern new penalty-phase proceeding after remand).

"(b)   Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society * * *; and

"(c)   If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased."[7]

The state was required to prove affirmative answers to those questions beyond a reasonable doubt. *See former* ORS 163.150(3) (1985), *renumbered as* ORS 163.150(1)(d) (1989) (so providing). Further, defendant also was permitted to introduce general mitigating evidence that militated against imposition of the death penalty. *See Wagner II*, 309 Or at 14 (mitigating evidence beyond scope of three statutory issues admissible under pre-1989 version of ORS 163.150(1)(a)).

■      Before defendant's second penalty-phase proceeding, the 1989 Legislative Assembly enacted a "fourth question," set out at ORS 163.150(1)(b)(D), encompassing general mitigating evidence that a defendant previously might have proffered under the reasoning set out in *Wagner II*, 309 Or at 14. *See* 336 Or at 453 (setting out ORS 163.150(1)(b)(D) (1989)). The 1991 Legislative Assembly subsequently amended that question, still in effect today, to ask a penalty-phase jury "[w]hether the defendant should receive a death sentence." ORS 163.150(1)(b)(D); Or Laws 1991, ch 885, § 2. That fourth question, unlike the first three statutory questions set out in ORS 163.150(1)(b)(A) to (C), is not subject to any burden of proof. *See, e.g.*, *State v. Fanus*, 336 Or 63, 70, 79 P3d 847 (2003) (because fourth question frames discretionary determination for jury, it imposes no burden of proof).[8]

---

[7] The current version of ORS 163.150(1)(b)(A) to (C) is virtually identical to the part of *former* ORS 163.150(2)(a) to (c) (1985) that is quoted in the text above.

[8] As this court recently noted in *Fanus*, 336 Or at 66 n 4, the jury considers the third question set out in ORS 163.150(1)(b)(C), regarding victim provocation, only when that question is relevant under the facts at hand. In defendant's third penalty-phase proceeding that third statutory question was not relevant, and the trial court therefore submitted only three questions—the first, second, and fourth questions under ORS 163.150(1)(b)—to the jury.

Before defendant's third penalty-phase proceeding, the 1995 Legislative Assembly amended the death-penalty statutory scheme expressly to permit the introduction of relevant "aggravating" evidence and victim-impact evidence, adding the following text to ORS 163.150(1)(a):

"In the [penalty-phase] proceeding, evidence may be presented as to any matter that the court deems relevant to sentence *including, but not limited to, victim impact evidence relating to the personal characteristics of the victim or the impact of the crime on the victim's family and any aggravating or mitigating evidence relevant to the issue in paragraph (b)(D) of this subsection*[.]"[9]

Or Laws 1995, ch 531, § 2 (emphasis added). The reference to "paragraph (b)(D) of this subsection" pertained to the fourth statutory question for the jury, discussed above.

Two years later, the 1997 Legislative Assembly incorporated the 1995 amendment to ORS 163.150(1)(a) into the jury instruction on the fourth question, by adding the following text to ORS 163.150(1)(c)(B):

"The court shall instruct the jury to answer the question in paragraph (b)(D) of this subsection 'no' if, after considering *any aggravating evidence and any mitigating evidence* concerning any aspect of the defendant's character or background, or any circumstances of the offense *and any victim impact evidence as described in subsection (1)(a) of this section*, one or more of the jurors believe that the defendant should not receive a death sentence."

Or Laws 1997, ch 784, § 1 (emphasis added).

In his third penalty-phase proceeding, defendant argued that retroactive application of the foregoing 1995 and 1997 amendments to ORS 163.150(1)(a) and (c)(B) violated

---

[9] That text remains in the current version of the statute. At the time of defendant's crimes in 1987, that part of ORS 163.150(1)(a) provided as follows:

"In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence[.]"

ORS 163.150(1)(a) (1985).

the prohibitions against *ex post facto* laws contained in Article I, section 21, of the Oregon Constitution and Article I, section 10, of the United States Constitution. The trial court disagreed, and the state thereafter introduced evidence, discussed further below, falling within the parameters of the amendments.

In any subsequent penalty-phase proceeding, the state is likely to offer the same or similar aggravating and victim-evidence against defendant, and defendant is likely to make the same objections. Accordingly, we address those objections here, beginning with defendant's state constitutional challenge to retroactive application of the "any aggravating evidence" provisions of the 1995 and 1997 amendments. *See, e.g., State v. Montez*, 324 Or 343, 363, 927 P2d 64 (1996), *cert den*, 520 US 1233 (1997) (addressing defendant's state constitutional argument before addressing his federal constitutional argument).

1. *Retroactive Application of "Any Aggravating Evidence" Provisions of ORS 163.150(1)(a) and (c)(B) to Defendant's Remanded Penalty-Phase Proceeding*

As noted, at the time of his crimes in 1987, defendant was permitted under ORS 163.150(1)(a) (1985) to introduce general mitigating evidence that militated against imposition of the death penalty. *Wagner II*, 309 Or at 14. Further, in *Guzek II*, this court concluded that, in enacting the 1989 version of ORS 163.150(1)(b)(D) (that is, the original "fourth question"), the legislature intended to submit to the jury the question "whether any *mitigating* circumstances exist that would justify a sentence of life rather than death." 322 Or at 263 (emphasis in original). By contrast, after the 1995 and 1997 amendments to ORS 163.150(1)(a) and (c)(B), the death-penalty statutory scheme now allows admission of "any aggravating evidence" under the fourth question.

Defendant argues that the 1995 and 1997 amendments to ORS 163.150(1)(a) and (c)(B) fundamentally altered the nature of the fourth question, by allowing the state to introduce new and different evidence than it was permitted to introduce at the time when defendant committed his crimes. Thus, defendant argues, retroactive application of

the later-enacted amendments to his penalty-phase proceedings violates the *ex post facto* prohibition set out in Article I, section 21, *see* 336 Or at 429 n 5 (setting out provision), which this court recently analyzed in *State v. Fugate*, 332 Or 195, 210-15, 26 P3d 802 (2001).

The state responds, first, that the *ex post facto* prohibition of Article I, section 21, applies to only those changes in the rules of evidence that make *conviction* more likely. Therefore, the state contends, that prohibition does not apply to changes in the law concerning the admissibility of evidence in penalty-phase proceedings, because such proceedings are *sentencing* proceedings only. Alternatively, the state argues that the 1995 and 1997 amendments to ORS 163.150(1)(a) and (c)(B) did not expand the range of aggravating evidence that could have been admitted in a penalty-phase proceeding at the time of defendant's crimes in 1987. It follows, the state argues, that retroactive application of the amendments to defendant's remanded penalty-phase proceeding does not amount to a state *ex post facto* violation.

We begin with the discussion of Article I, section 21, that this court offered in *Fugate*. In that case, this court reiterated that Article I, section 21, prohibits the application of the types of laws that the framers of the Oregon Constitution understood to be prohibited by the *Ex Post Facto* Clause of the United States Constitution. 332 Or at 214. Those laws fall into the four categories that Justice Chase identified in his opinion in *Calder v. Bull*, 3 US (3 Dall) 386, 390-91, 1 L Ed 648 (1798), quoted in *Fugate*, 332 Or at 212:

> " 'I will state what laws I consider *ex post facto* laws, within the words and the intent of the prohibition. 1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. *4th. Every law that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offence, in order to convict the offender.* All these and similar laws are manifestly unjust and oppressive.' "

(Emphasis in *Fugate*.) In *Fugate*, this court explicitly held what it had implied in an earlier decision, *State v. Cookman*, 324 Or 19, 31, 920 P2d 1086 (1996), namely, that Article I, section 21, prohibited laws that fit within the "fourth category" of *Calder*, that is, "laws that alter the rules of evidence in a one-sided way that makes conviction of the defendant more likely." *Fugate*, 332 Or at 213.

As noted above, the state first seeks to distinguish the "any aggravating evidence" provisions of the 1995 and 1997 amendments to ORS 163.150(1)(a) and (c)(B) from those laws that belong in *Calder*'s "fourth category" by emphasizing that the death-penalty statutory scheme describes a proceeding for "sentencing," not "convicting," a defendant. Although we agree that penalty-phase proceedings are "sentencing" proceedings, we disagree that identifying them in that way exempts them from the prohibition described in *Calder*'s fourth category, as explained below.

First, we note that the categories described in *Calder* are general ones, used to summarize the types of *ex post facto* laws that the federal constitutional provision then prohibited. Justice Chase made that clear in his opinion by stating that the laws described in those categories and "[a]ll * * * similar laws* are manifestly unjust and oppressive." 3 US (3 Dall) at 390-91 (emphasis added). The question before us, then, is whether a change in the rules of evidence applicable to a penalty-phase proceeding that permits "different testimony than the law required at the time of the commission of the offen[s]e," *id.* at 390, to sentence a defendant to death is sufficiently similar to the laws described in *Calder*'s fourth category to proscribe the application of that change in the law on *ex post facto* grounds.

We turn to the proceedings under ORS 163.150. Although those proceedings concern what sentence a court must impose, they are otherwise similar to a criminal trial that results in a conviction. For example, the state is required to prove its case under the first three statutory questions set out in ORS 163.150(1)(b)(A) to (C) beyond a reasonable doubt. *See* ORS 163.150(1)(d) (so stating). The decision whether the defendant may be sentenced to death is made by the jury, ORS 163.150(1)(a), and it must be unanimous, ORS

163.150(1)(e). Moreover, by contrast to other sentencing proceedings, the Oregon Evidence Code applies. OEC 101(4)(d).[10] In our view, those characteristics of a penalty-phase proceeding make it sufficiently similar to an ordinary trial, and its outcome sufficiently similar to a "conviction," to consider changes in the rules of evidence that apply in such proceedings the same, for purposes of an *ex post facto* analysis, as changes in the rules of evidence that apply in guilt-phase proceedings of other kinds of trials.[11] Therefore, when a change in the law alters the rules of evidence in a one-sided way that makes a sentence of death more likely than it would have been at the time that a defendant committed aggravated murder, application of that law to the defendant offends the *ex post facto* prohibition of Article I, section 21, as explained in *Fugate*.

Turning to the 1995 and 1997 amendments to ORS 163.150(1)(a) and (c)(B) that provided for admission of "any aggravating evidence," we agree with defendant that they amounted to "one-sided" changes, *Fugate*, 332 Or at 213, that made a sentence of death more likely than it would have been before the changes. As noted above, at the time of defendant's crimes, the state's only express statutory avenue for introducing evidence against a defendant during a penalty-phase proceeding was in relation to the first three questions now set out at ORS 163.150(1)(b)(A) to (C). Specifically, the state

_____

[10] That rule provides that the Oregon Evidence Code does not apply in sentencing proceedings, "except proceedings under ORS 138.012 and 163.150," concerning death-penalty proceedings, "or as required by ORS 137.090," concerning proceedings to determine circumstances in aggravation or mitigation of punishment in other criminal cases.

[11] The United States Supreme Court also has recognized that penalty-phase proceedings in capital trials are analogous to guilt-phase proceedings for the purpose of analyzing constitutional protections that must be afforded the accused. *See, e.g., Strickland v. Washington*, 466 US 668, 686-87, 104 S Ct 2052, 80 L Ed 2d 674, *reh'g den*, 467 US 1267 (1984) (concluding that capital sentencing proceedings under Florida law were indistinguishable from ordinary trial for purposes of right to counsel, because they were "sufficiently like a trial in [their] adversarial format and in the existence of standards for decision"). As the Court noted in its opinion in *Monge v. California*, 524 US 721, 731-32, 118 S Ct 2246, 141 L Ed 2d 615 (1998):

"The penalty phase of a capital trial is undertaken to assess the gravity of a particular offense and to determine whether it warrants the ultimate punishment; it is in many respects a continuation of the trial on guilt or innocence of capital murder."

could introduce evidence that was relevant to only the questions whether a defendant's conduct had been committed deliberately and with the reasonable expectation that death would result; whether a probability existed that the defendant would commit violent criminal acts constituting a continuing threat to society; and whether the defendant's conduct had been unreasonable in response to any provocation by the victim. Further, the state's evidence on the first three statutory questions was (and still is) subject to a burden of proof, in that the state was required to prove affirmative answers to those questions beyond a reasonable doubt. The defendant, by contrast, was permitted to introduce general mitigating evidence, subject to no burden of proof requirement, that supported imposition of a sentence other than death.

After the 1995 and 1997 amendments to ORS 163.150(1)(a) and (c)(B), the state now has an *additional* express statutory avenue to introduce evidence *against* a defendant, because it now may introduce "any aggravating evidence" that is not relevant to the first three statutory questions and that pertains to a statutory question that is not subject to any burden of proof. That amounts to a "one-sided" change that benefits only the state and, effectively, makes a sentence of death more likely than it would have been before the change. Therefore, Article I, section 21, prohibits retroactive application of the "any aggravating evidence" provisions of ORS 163.150(1)(a) and (c)(B) to defendant on remand, as discussed in *Fugate*.

The state nonetheless argues that, because it was permitted at the time of defendant's crimes in 1987 to introduce a broad range of aggravating evidence under the first three statutory questions, "it is difficult to hypothesize [any] aggravating evidence that, while admissible [under the amendment to ORS 163.150(1)(a)] in 1995, would not have been admissible in 1987." The state continues that the scope of its aggravating evidence at the time of defendant's crimes went beyond the first three statutory questions because the state permissibly could have introduced aggravating evidence to controvert any mitigating evidence that defendant offered in his behalf. Finally, the state emphasizes that,

under the 1995 amendment to ORS 163.150(1)(a), any evidence offered in aggravation still must be "relevant to sentence." In the state's view, given the broad scope of its potential evidence at the time of defendant's crimes in 1987, coupled with the continued requirement that its evidence be relevant to the sentencing determination, it is highly unlikely that any *relevant* aggravating evidence against defendant would have been subject to exclusion in 1987.

Although we agree with the state that, at the time of defendant's crimes in 1987, it was permitted to introduce a broad range of aggravating evidence, we disagree that the 1995 and 1997 amendments essentially effected no change to the state's ability to introduce aggravating evidence against defendant at a remanded penalty-phase proceeding. As explained above, the state now may introduce "any aggravating evidence" that is not relevant to the first three statutory questions and that pertains to a statutory question that is not subject to any burden of proof; further, such evidence is not limited to rebutting any particular mitigating evidence offered by a defendant. Stated differently, the 1995 and 1997 amendments had the effect of removing two limitations on the state's evidence that heretofore ran in a defendant's favor, that is, the requirements that all evidence introduced against the defendant (and therefore supporting imposition of the death penalty) would (1) be limited in its relevance either to the first three statutory questions or to rebut any particular mitigating evidence that the defendant proffered; and (2) respecting the first three statutory questions, ultimately implicate the highest possible burden of proof. Such a change in the law undoubtedly qualifies as a "one-sided" change that makes imposition of a sentence of death more likely, retroactive application of which would contravene Article I, section 21.

In sum, we conclude that, in defendant's remanded penalty-phase proceeding, the trial court is precluded from retroactively applying the "any aggravating evidence" provisions of the 1995 and 1997 amendments to ORS 163.150(1)(a) and (c)(B). Any determination of the relevance of the state's aggravating evidence against defendant therefore must be in relation to the first three statutory questions set out in ORS

163.150(1)(b)(A) to (C) or in relation to rebuttal of any partic-
ular mitigating evidence offered by defendant.[12]

2. *Retroactive Application of Victim-Impact Evidence Provisions of ORS 163.150(1)(a) and (c)(B) to Defendant's Remanded Penalty-Phase Proceeding*

As discussed above, in addition to adding a provision allowing for "any aggravating evidence," the 1995 amend-ment to ORS 163.150(1)(a) also provided for the admission of "victim impact evidence relating to the personal characteris-tics of the victim or the impact of the crime on the victim's family." *See* 336 Or at 432 (quoting Or Laws 1995, ch 531, § 2). The 1997 amendment to ORS 163.150(1)(c)(B) similarly required that the jury consider, as part of its consideration of the fourth question, "any victim impact evidence as described in subsection (1)(a) of this section." *See* 336 Or at 432 (quoting Or Laws 1997, ch 784, § 1).

In defendant's third penalty-phase proceeding, the state introduced evidence of the victims' personal character-istics and of the impact that their murders had on their two daughters, on their niece and nephew, and on Rod Houser's brother. Defendant objected to the state's victim-impact evidence, arguing that, like the "any aggravating evidence" provisions of the 1995 and 1997 amendments to ORS 163.150(1)(a) and (c)(B), retroactive application of the victim-impact evidence provisions violated the state and federal con-stitutional prohibitions against *ex post facto* laws. The trial

_____

[12] In the "preservation" section of his assignment of error challenging retroac-tive application of the "any aggravating evidence" provisions of the 1995 and 1997 amendments ORS 163.150(1)(a) and (c)(B), defendant refers to general evidence of "misconduct" on his part, including evidence of an act of perjury, that the state suc-cessfully introduced at his third penalty-phase proceeding over his objection, apparently to establish that defendant had exhibited a pattern of antisocial behav-ior. Defendant does not elaborate on the particular evidence that, in his view, the state introduced under the current "any aggravating evidence" statutory provisions.

We acknowledge the possibility that the evidence that defendant points to in his brief might have been admissible as evidence of "future dangerousness" under the second statutory question set out in ORS 163.150(1)(b)(B). As we have clarified in the text above, on remand, the trial court must determine if such evidence is rel-evant and, therefore, generally admissible under ORS 163.150(1)(b)(B) (or under the other statutory questions on which the state bears the burden of proof), or whether the evidence qualifies solely as "any aggravating evidence" not relevant to the first three questions and not rebutting any particular mitigating evidence offered by defendant.

court disagreed, and the jury considered the evidence. On review, defendant renews both his state and federal challenges, which we discuss in turn below.

### a. *Oregon Constitution*

■ As defendant points out, under the 1989 version of the death-penalty statutory scheme in place at the time of his second penalty-phase proceeding (and, indisputably, under the 1985 version of that statute in place at the time of his crimes in 1987), the admission of victim-impact evidence constituted reversible error. *Guzek II*, 322 Or at 270. Defendant argues that, accordingly, the victim-impact evidence provisions of the 1995 and 1997 amendments to ORS 163.150(1)(a) and (c)(B) constituted "one-sided" changes in the law that now allow the state to introduce different evidence than it was permitted to introduce at the time when defendant committed his crimes. As with his challenge to the "any aggravating evidence" provision, defendant argues that retroactive application of those provisions violates the *ex post facto* prohibition of Article I, section 21, under *Fugate*.

The state counters that the state constitutional *ex post facto* prohibition does not proscribe retroactive application of the victim-impact evidence provisions of the 1995 and 1997 amendments to ORS 163.150(1)(a) and (c)(B) because those changes in the law were not "one-sided." That is so, the state argues, because a defendant also "conceivably could benefit from the introduction of victim-impact evidence." Alternatively, the state argues that, even if Article I, section 21, formerly proscribed the admission of victim-impact evidence against defendant, that proscription will not apply on remand because it has been superseded by Article I, section 42, of the Oregon Constitution, which, among other things, confers on victims the "right * * * to be heard" at sentencing in criminal proceedings.

We need not resolve the parties' dispute as to whether retroactive application of the victim-impact evidence provisions of the 1995 and 1997 amendments to ORS 163.150(1)(a) and (c)(B) would violate the state constitutional prohibition against *ex post facto* laws. As explained below, even if defendant's state *ex post facto* analysis were correct, we agree with the state that a victim's "right * * * to be

heard" under Article I, section 42(1)(a), of the Oregon Constitution supersedes any Article I, section 21, protection applicable to defendant, as explained below.

The voters adopted what is now Article I, section 42, of the Oregon Constitution as a legislatively referred constitutional amendment in 1999. Among other things, that amendment provided that crime victims have "[t]he right * * * to be heard at * * * the sentencing * * * disposition[.]" Or Const, Art I, § 42(1)(a). The amendment further provided that the rights set out therein applied to all criminal proceedings "pending or commenced on or after" the effective date of the amendment, that is, December 2, 1999. Or Const, Art I, § 42(2).

The state's argument that, on remand, Article I, section 42(1)(a) will require admission of relevant victim-impact evidence against defendant presents a two-part question. First, we must determine whether the state's offering of the type of victim-impact evidence that the 1995 amendment to ORS 163.150(1)(a) describes, that is, evidence "relating to the personal characteristics of the victim or the impact of the crime on the victim's family," qualifies as a victim's "right * * * to be heard" under Article I, section 42(1)(a). Because we conclude that it does, and because, by its terms, Article I, section 42, will apply to any subsequent penalty-phase proceeding in this case, we must address a second question: Whether the victims' right to be heard requires the trial court on remand to admit relevant victim-impact evidence against defendant despite any protection against *ex post facto* laws that Article I, section 21, might afford him.

We begin with the text of Article I, section 42. *See Shilo Inn v. Multnomah County*, 333 Or 101, 116-17, 36 P3d 954 (2001), *modified on recons on other grounds*, 334 Or 11, 45 P3d 107 (2002) (when interpreting referred constitutional provision, court's task is to discern intent of voters; best evidence of voters' intent is text of provision). It provides, in part:

"(1) To preserve and protect the right of crime victims to justice, to ensure crime victims a meaningful role in the criminal and juvenile justice systems, to accord crime victims due dignity and respect and to ensure that criminal

and juvenile court delinquency proceedings are conducted to seek the truth as to the defendant's innocence or guilt, and also to ensure that a fair balance is struck between the rights of crime victims and the rights of criminal defendants in the course and conduct of criminal and juvenile court delinquency proceedings, *the following rights are hereby granted to victims in all prosecutions for crimes* and in juvenile court delinquency proceedings:

"(a) *The right* to be present at and, upon specific request, to be informed in advance of any critical stage of the proceedings held in open court when the defendant will be present, and *to be heard at* the pretrial release hearing and *the sentencing* or juvenile court delinquency *disposition*;

"* * * * *

"(2) *This section applies to all criminal* and juvenile court delinquency *proceedings pending or commenced on or after the effective date of this section.* Nothing in this section reduces a criminal defendant's rights under the Constitution of the United States. *Except as otherwise specifically provided, this section supersedes any conflicting section of this Constitution.* * * *

"(3) As used in this section:

"* * * * *

"(c) 'Victim' means any person determined by the prosecuting attorney to have suffered direct financial, psychological or physical harm as a result of a crime and, in the case of a victim who is a minor, the legal guardian of the minor. In the event that no person has been determined to be a victim of the crime, the people of Oregon, represented by the prosecuting attorney, are considered to be the victims. * * *"

(Emphasis added.)

The text of Article I, section 42, permits us to answer the first question quickly. Article I, section 42(1)(a), confers the "right * * * to be heard" on those persons that the state deems to have suffered harm as a result of a crime (defined in section (3)(c) as "[v]ictim[s]"). We need not consider the full breadth of that right to conclude that it generally encompasses the more narrowly defined victim-impact evidence

described in the 1995 amendment to ORS 163.150(1)(a) and, relatedly, in the 1997 amendment to ORS 163.150(1)(c)(B). The right of a murder victim's family member (who also can qualify as a "victim" under Article I, section 42) "to be heard" in a penalty-phase proceeding means, at a minimum, the right to offer relevant evidence of the murder victim's personal characteristics and of the impact of the crime upon the murder victim's family. In the context of a capital penalty-phase proceeding, the state's ability to offer victim-impact evidence under ORS 163.150(1)(a) ordinarily will serve as the mechanism for a victim's exercise of that right.

Because, as noted above, Article I, section 42, "applies to all criminal * * * proceedings pending or commenced on or after" December 2, 1999, it follows that the Housers' family members will have the right in any subsequent penalty-phase proceeding in this case to offer evidence of the Housers' personal characteristics and of the impact of the crimes on their family. That conclusion conflicts with defendant's contention that Article I, section 21, insulates him from the introduction of victim-impact evidence through its prohibition against *ex post facto* laws. Accordingly, assuming, without deciding, that defendant is correct respecting the applicability of Article I, section 21, we must determine which "right" will govern the question of the admissibility of victim-impact evidence in any further proceeding in this case: the victims' right to be heard or defendant's right to be free from application of an *ex post facto* law. To answer that question, we again turn to the text of the Article I, section 42.

Article I, section 42(2), provides, in part:

"Nothing in this section reduces a criminal defendant's rights under the Constitution of the United States. Except as otherwise specifically provided, this section supersedes any conflicting section of this Constitution."

By providing that Article I, section 42, does not "reduce[ ]" a defendant's federal constitutional rights and that it supersedes any conflicting section of the Oregon Constitution, that text anticipates that the victim's right to be heard might be incompatible with a criminal defendant's constitutional right in a particular case. At the same time, the text establishes that the voters intended the anticipated conflict to be

resolved in one of two ways, depending on the source of the criminal defendant's conflicting right.

According to the first of the two sentences quoted above, the voters made clear that they did not intend to attempt to change any right previously guaranteed to a criminal defendant under the United States Constitution. Accordingly, in the event of a conflict between a victim's right to be heard and a criminal defendant's *federal* constitutional right, it is the victim's right to be heard that must give way.[13] By contrast to that deference to federal constitutional law, Article I, section 42, provides that it will supersede any conflicting section of the Oregon Constitution. Read in context, that statement makes clear that, in the event of a conflict between a victim's right to be heard under Article I, section 42(1)(a), and a criminal defendant's right under the *Oregon* Constitution, it is the victim's right that has constitutional priority.

Applying the foregoing understanding of Article I, section 42, to this case, we conclude the following. In a subsequent death-penalty proceeding in this case, the Housers' family members will have the right under Article I, section 42(1)(a), to offer relevant victim-impact evidence as described in the 1995 amendment to ORS 163.150(1)(a) and later included in the 1997 amendment to ORS 163.150(1)(c)(B). Although retroactive application of those amendments to defendant might implicate the *ex post facto* prohibition under Article I, section 21, defendant's right to be free from retroactive application of the amendments is superseded in this context by the right conferred on the Housers' family members under Article I, section 42(1)(a).

### b. *United States Constitution*

Defendant also argues that retroactive application of the victim-impact evidence provisions of the 1995 and 1997 amendments to ORS 163.150(1)(a) and (c)(B) to his

---

[13] What we emphasize here is that the victim's right to be heard must give way as a matter of Oregon constitutional law, because Article I, section 42(2), of the Oregon Constitution specifically provides for a criminal defendant's federal constitutional rights not to be "reduce[d]" if in conflict with the victim's right to be heard. It is of no consequence to our discussion that the victim's right to be heard must give way in such circumstances as a matter of *federal* constitutional law, regardless of the wording of Article I, section 42.

remanded penalty-phase proceeding violates the prohibition of *ex post facto* laws set out in Article I, section 10, of the United States Constitution. *See* 336 Or at 429 n 5 (setting out provision). The state counters that, according to the analysis that the United States Supreme Court set out in *Carmell v. Texas*, 529 US 513, 120 S Ct 1620, 146 L Ed 2d 577 (2000), it does not. For the reasons set out below, we agree with the state's *ex post facto* analysis under federal law.

When interpreting the prohibition against *ex post facto* laws set out in Article I, section 10, of the United States Constitution, the Supreme Court relies on *Calder*'s categories. The Court, like this one, has held that alterations to the rules of evidence in a manner that makes conviction more likely fall into the fourth category of laws under *Calder* that violate *ex post facto* principles. *Carmell*, 529 US at 522-25.[14] However, the Court has offered a specific interpretation, as a matter of federal constitutional law, of the kind of change in the rules of evidence that facilitates an easier conviction. Under Article I, section 10, as the Court explained in *Carmell*, a change in the rules of evidence that facilitates an easier conviction—like changes in the law relating to *Calder*'s first three categories—is one that "subverts the presumption of innocence."[15] *Id.* at 532. Specifically, the evidentiary change must be one that alters the sufficiency-of-evidence standard or otherwise "reduc[es] the quantum of

---

[14] The Supreme Court in *Carmell* also recognized that Justice Chase had set out alternative wording of the four categories of *ex post facto* laws identified in *Calder*. As to the fourth category, Justice Chase's alternative wording provided:

"[Ex post facto laws] violated the rules of evidence, to supply a deficiency of legal proof, by admitting one witness, when the existing law required two; by receiving evidence without oath; or the oath of the wife against the husband; or other testimony which the courts of justice would not admit."

*Carmell*, 529 US at 522 n 9 (quoting *Calder*, 3 US (Dall) at 389).

In *Stogner v. California*, 539 US 607, 123 S Ct 2446, 2452, 156 L Ed 2d 544 (2003), the Supreme Court quoted *Calder*'s alternative wording with approval in determining that a retroactive statute of limitations extension likely would fall into the fourth category. *See also id.* at 2450-52 (applying alternative wording of second category to invalidate extended statute of limitations at issue), 2458 (citing *Carmell* for proposition that *Calder*'s alternative descriptions remain viable).

[15] In *Fugate*, this court specifically rejected that interpretation insofar as the Oregon Constitution is concerned. 332 Or at 213. As noted in *Fugate*, this court's inquiry under Article I, section 21, concerns the understanding of the *ex post facto* prohibition that the framers of the Oregon Constitution had in mind. That understanding was influenced by *Calder* and by the interpretation of *Calder* that

evidence necessary to meet the burden of proof" to convict. *Id.* at 532-33. Applying that standard to a penalty-phase proceeding, we construe it as a standard that focuses on whether the change in the law lowers the minimum quantum of evidence required to obtain a sentence of death.

With that standard in mind, we again turn to the 1995 and 1997 amendments to ORS 163.150(1)(a) and (c)(B) that permit the admission of victim-impact evidence. We agree with the state that nothing about those amendments lowers the quantum of proof necessary for the state to obtain a sentence of death. The state must prove each issue submitted to the jury under ORS 163.150(1)(b)(A) to (C) beyond a reasonable doubt, ORS 163.150(1)(d), just as Oregon law previously required it to do. Although the retroactive application of a change in the law that permits the state to introduce a new kind of evidence against a defendant might tip the balance in favor of the state, it does not "unfair[ly]" tip it, *Carmell*, 529 US at 533 n 23, for purposes of the federal *Ex Post Facto* Clause, as does a change in the law that reduces the sufficiency of the evidence standard. That distinction is dispositive. As the Supreme Court explained in *Carmell*, not every rule that increases the state's likelihood of success on the merits constitutes an *ex post facto* law under Article I, section 10. For example, the Court observed that rules that permit evidence to be admitted at trial, whether one-sided or not,

> "* * * do not at all subvert the presumption of innocence, because they do not concern whether the admissible evidence is sufficient to overcome the presumption. Therefore, to the extent one may consider changes to such laws as 'unfair' or 'unjust,' they do not implicate the same *kind* of unfairness implicated by changes in rules setting forth a sufficiency of the evidence standard."

had been offered in 1822 by the Indiana Supreme Court in interpreting Article I, section 24, of the Indiana Constitution, on which Article I, section 21, of the Oregon Constitution is based. 332 Or at 211. The United States Supreme Court's inquiry, by contrast, concerns the understanding of the *ex post facto* prohibition offered in *Calder as further interpreted by the Court in its decisions over the course of two hundred years. See Carmell*, 529 US at 525 (citing Court's decisions from 1867 through 1997 that relied on *Calder*'s fourth category).

*Id.* (emphasis in original). Accordingly, the admission of victim-impact evidence against defendant under the 1995 and 1997 amendments to ORS 163.150(1)(a) and (c)(B) does not violate the *Ex Post Facto* Clause of the United States Constitution.

B. *Exclusion of Evidence Offered to Impeach Testimony of State Witnesses Wilson and Cathey*

We turn to defendant's assignments of error concerning the trial court's decision to exclude evidence that defendant offered to impeach the transcript testimony of state witnesses Wilson and Cathey.

Wilson and Cathey were codefendants of defendant Guzek. The three men had gone to the Housers' home together. Wilson had shot Rod Houser at defendant's prompting, and Cathey had stabbed Rod Houser in an effort to make the murder appear to have been a "cult killing." Both Wilson and Cathey entered into plea agreements. They pleaded guilty to aggravated murder, agreed to cooperate in the prosecution of defendant, and received sentences of life imprisonment.

Wilson and Cathey testified against defendant during the guilt phase of defendant's first trial. They described their actions before the murders, including the preparations that they had made and their intent to kill the Housers. They described what had happened once they had arrived at the Housers' home, including the instructions that defendant had given them. They also described what had happened after the murders, including defendant's payment to them for their participation.

The state sought to call Wilson and Cathey as witnesses against defendant in his second penalty-phase proceeding, but they refused to testify. The state again sought to call them during this third penalty-phase proceeding. Wilson and Cathey again refused. Cathey appeared in court and stated, without explanation, that he refused to testify. Wilson appeared by telephone and stated that, on the advice of counsel in connection with his federal habeas corpus proceedings, he was invoking his right under the Fifth Amendment not to testify. The trial court determined that Cathey and Wilson

were unavailable as witnesses, as described in OEC 804(1), and it permitted the state to introduce the transcripts of their prior testimony.[16]

Defendant sought to refute Wilson's and Cathey's transcript testimony by offering evidence that tended to contradict that testimony, including evidence of inconsistent statements by the witnesses themselves. For example, defendant made an offer of proof that he would call as a witness a lawyer who had worked on defendant's second penalty-phase trial and to whom Cathey had stated in 1991 that Cathey, Wilson, and defendant had had no intention to kill the Housers before arriving at their home. That lawyer also would have testified that Cathey had told her that defendant had not directed Wilson to shoot Rod Houser. Defendant further made an offer of proof that he would have called as a witness an investigator to whom Wilson had stated in 1997 that there had been no "leader" among the codefendants and that they had not had any plan to kill the Housers. The trial court sustained the state's objections to admission of the foregoing evidence.[17] On review, defendant argues, among other things, that his proffered evidence refuting Wilson's and Cathey's transcript testimony did not qualify as hearsay and was relevant for impeachment purposes.

At the outset, we offer an important point of clarification. Under ORS 138.012(2)(b), after remand for a new penalty-phase proceeding, the guilt-phase proceeding transcripts are admissible in the new penalty-phase proceeding. For that reason alone, Wilson's and Cathey's transcript testimony from the guilt phase of defendant's first trial was admissible in defendant's third penalty-phase proceeding. However, the state did not offer the transcripts only because they were transcripts from the guilt-phase proceeding. Instead, the state relied on Wilson's and Cathey's transcript testimony, in lieu of their live testimony, also to prove two

---

[16] Defendant assigns error on review to the trial court's admission of the Wilson and Cathey transcripts. We conclude that the trial court properly admitted those transcripts, and we decline to address defendant's argument further here.

[17] The trial court had several reasons for excluding the evidence at issue. We do not address each of those reasons; instead, we limit our discussion to the parties' arguments respecting the admissibility of that evidence.

elements of the state's case in the *penalty-phase proceeding*, namely, that defendant had acted deliberately within the meaning of ORS 163.150(1)(b)(A) and that a probability existed that defendant would commit violent criminal acts in the future, thus posing a continuing threat to society within the meaning of ORS 163.150(1)(b)(B). In other words, even though Wilson's and Cathey's transcript testimony introduced during the penalty-phase proceeding consisted of their testimony from the guilt phase, the state put that testimony to an additional use in the penalty phase, specifically, to prove that defendant should receive a sentence of death. That is significant, because it demonstrates that the state made the credibility of Wilson and Cathey relevant to the *penalty-phase proceeding* and opened the door for defendant's impeachment of their testimony. *See State v. Johanesen*, 319 Or 128, 135-37, 873 P2d 1065 (1994) (discussing relevance of extrinsic evidence for impeaching credibility of witness).

That said, we turn to the state's argument that the trial court properly excluded defendant's proffered impeachment evidence refuting Wilson's and Cathey's transcript testimony because that evidence qualified as hearsay, not within any exception. The state asserts that defendant "does not appear to dispute [the] proposition" that his proffered evidence was hearsay. We disagree. Defendant does not concede that he offered his evidence refuting Wilson's and Cathey's transcript testimony only to prove the truth of the matter asserted therein. *See* OEC 801(3) (" 'Hearsay' is a statement, other than one made by the declarant while testifying * * *, offered in evidence to prove the truth of the matter asserted."). Instead, defendant argues that his proffered evidence of inconsistent statements by Wilson and Cathey was "very powerful" impeachment evidence, in other words, that it tended to show that the jury should not trust Wilson's and Cathey's transcript testimony about defendant's role in the murders. Because defendant offered his evidence for that purpose, it did not qualify as hearsay, and the trial court erred by excluding it on that basis.[18] *See Blue Ribbon Bldgs.*

_____

[18] Of course, defendant's evidence of inconsistent statements by Wilson and Cathey also had a *possible* hearsay purpose: To prove that defendant had not intended to kill the Housers before he had arrived at their residence or to prove

*v. Struthers*, 276 Or 1199, 1205, 557 P2d 1350 (1976) (testimony of out-of-court statement not hearsay, because offered for impeachment purposes to show that opponent's witness had made inconsistent statement).

## C. *Exclusion of Alibi Evidence*

We now turn to defendant's argument that the trial court erred in excluding his alibi evidence during his third penalty-phase proceeding.

According to the state's case, the Housers were murdered in the early morning hours of June 28, 1987. At his third penalty-phase proceeding, defendant sought the admission of two items of evidence that tended to show that he could not have been at the Housers' home at that time: (1) the transcript of defendant's grandfather's testimony, admitted during the guilt phase, that defendant had been with him from 9:00 p.m. on June 28 until 2:00 a.m. on June 29, 1987; and (2) the testimony of defendant's mother that defendant had been at her home from shortly after 2:00 a.m. on the morning of June 29, 1987, and that, when she awoke at 4:20 a.m. on the same day, defendant was sleeping on a loveseat at her house. The trial court excluded that evidence, apparently on relevance grounds.[19]

On review, defendant argues that the trial court erred in excluding that evidence because it was "mitigating evidence" relevant to the fourth question under ORS

that defendant had not played a leadership role in the murders. A limiting instruction to the jury that prior inconsistent statements by a witness are admissible solely for purposes of impeachment often assists in guarding against a jury using such statements for the wrong purpose.

We also note that our conclusion that defendant's proffered evidence had a nonhearsay purpose does not require that that evidence be admitted at any subsequent penalty-phase proceeding. Whether the evidence is admissible in a subsequent proceeding will depend, first, on the purpose for which defendant offers it and, second, on the trial court's evaluation of any objection that the state might raise. Our conclusion here is solely that we disagree with the state that defendant proffered evidence of inconsistent statements by Wilson and Cathey for a hearsay purpose only.

[19] The parties do not cite to the record when referring to the trial court's ruling in that regard. We also have not been able to confirm in the record the parties' position that the trial court excluded the alibi evidence on relevance grounds. However, a precise description of the trial court's actual ruling is not necessary to our opinion, because we focus on the issue as it may arise on remand.

163.150(1)(b), that is, "[w]hether the defendant should receive a death sentence." ORS 163.150(1)(b)(D). The state responds that the trial court properly excluded that evidence because alibi evidence, by definition, is relevant to only a defendant's guilt of the crime charged and, therefore, is not relevant to sentencing.

■ Because the analysis of their relevance is different, we address separately the two different types of alibi evidence that defendant sought to present to the jury. The transcript of defendant's grandfather's testimony—like the transcript of any other witness's testimony—was relevant and subject to consideration in the penalty phase, regardless of its substance, because it was "previously offered and received" during the trial on the issue of guilt. ORS 163.150(1)(a); *see also* ORS 138.012(2)(b) (if reviewing court vacates death penalty, transcript of all testimony, all exhibits, and other evidence properly admitted in prior guilt- and penalty-phase proceedings deemed admissible in remanded penalty-phase proceeding). The trial court therefore erred in sustaining the state's objection to admission of that evidence.

■ We turn to the question of the relevance of defendant's remaining alibi evidence—specifically, his mother's testimony. The state begins its argument with the unassailable premise that capital penalty-phase proceedings occur only if a jury has found a defendant guilty of the substantive offense. From that, the state urges that we infer that evidence of innocence is irrelevant to the penalty-phase proceeding. However, as is clear from this court's case law, as well as from decisions of the United States Supreme Court, the question of relevance of a capital defendant's proffered evidence in a penalty-phase proceeding is not that simple. Its relevance is, instead, a matter of statutory construction in the context of federal constitutional requirements. We now turn to that task, using the framework set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993) (court first considers text and context of statute at issue, as well as applicable case law construing statute). *See also Swarens v. Dept. of Rev.*, 320 Or 326, 331, 883 P2d 853 (1994) (context includes "statute's development through successive legislatures").

We begin by setting out the relevant parts of the death-penalty statutory scheme. ORS 163.150(1)(a) provides, in part:

> "In the [penalty-phase] proceeding, evidence may be presented as to any matter that the court deems relevant to sentence including, but not limited to, * * * *mitigating evidence relevant to the issue in paragraph (b)(D) of this subsection*[.]"

(Emphasis added.) ORS 163.150(1)(b) provides, in part:

> "Upon the conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:
>
> "* * * * *
>
> "(D)   Whether the defendant should receive a death sentence."

The jury instructions accompanying ORS 163.150(1)(b) are set out in ORS 163.150(1)(c), which provides:

> "(A)   The court shall instruct the jury to consider, in determining the issues in paragraph (b) of this subsection, *any mitigating circumstances offered in evidence, including but not limited to* the defendant's age, the extent and severity of the defendant's prior criminal conduct and the extent of the mental and emotional pressure under which the defendant was acting at the time the offense was committed.
>
> "(B)   The court shall instruct the jury to answer the question in paragraph (b)(D) of this subsection 'no' if, after considering any aggravating evidence *and any mitigating evidence concerning any aspect of the defendant's character or background, or any circumstances of the offense* and any victim impact evidence as described in paragraph (a) of this subsection, one or more of the jurors believe that the defendant should not receive a death sentence."

(Emphasis added.)

Our task here is to determine whether defendant's proffered evidence constitutes "mitigating evidence" that is "relevant" to the question set out in ORS 163.150(1)(b)(D), that is, "[w]hether * * * defendant should receive a death sentence." Answering that question, in turn, requires that we

determine the intended scope of "mitigating evidence" under the statutory scheme.

At the outset, we note that the wording of ORS 163.150(1)(c)(B)—instructing the jury to consider "any" mitigating evidence concerning "any" aspect of the defendant's character or background, or "any" circumstances of the offense—suggests, on its face, that the statutory category of "mitigating evidence" is quite broad and, possibly, unlimited.[20] It likely would follow under such a reading that defendant's mother's testimony would qualify as "mitigating evidence" under the statutory provisions, because it arguably relates to circumstances surrounding the offense that mitigate in defendant's favor (that is, defendant's argument that he had not been involved in the crime).

However, we must read the applicable text in its proper context, *PGE*, 317 at 611, which, here, most notably includes earlier versions of the statutory scheme and its development through successive legislatures. As this court has explained before (and as discussed further below), ORS 163.150(1)(b)(D) was enacted in 1989 and originally provided:

> "*If constitutionally required*, considering the extent to which the defendant's character and background, and the circumstance of the offense may reduce the defendant's moral culpability or blameworthiness for the crime, whether a sentence of death be imposed."

Or Laws 1989, ch 790, § 135b (emphasis added). Also in 1989, the legislature created a statutory jury instruction pertaining to all four questions set out in ORS 163.150(1)(b), now set out at ORS 163.150(1)(c)(A), *see* 336 Or at 452 (setting out ORS 163.150(1)(c)(A)), in substantially the same form as it exists today. *See* Or Laws 1989, ch 790, § 135b (enacting that

---

[20] "Any" is defined, in part, as follows:

"**1 :** one indifferently out of more than two : one or some indiscriminately of whatever kind; * * * **b :** one, no matter what one : EVERY—used as a function word esp. in assertions and denials to indicate one that is selected without restriction or limitation of choice * * * **3 a :** great, unmeasured, or unlimited in amount, quantity, number, time, or extent : up to whatever measure may be needed or desired * * *[.]"

*Webster's Third New Int'l Dictionary* 97 (unabridged ed 1993).

jury instruction as ORS 163.150(1)(c) (1989)); *see also* ORS 163.150(1)(b)(B) (1987) (text of jury instruction now set out as ORS 163.150(1)(c)(A) originally set out as instruction on second statutory question on future dangerousness).

In 1991, the legislature amended ORS 163.150(1)(b)(D) to reflect its current wording, that is, "[w]hether the defendant should receive a death sentence." Or Laws 1991, ch 885, § 2. Also in 1991, the legislature enacted the jury instruction specifically accompanying ORS 163.150(1)(b)(D), set out as ORS 163.150(1)(c)(B), in the following form:

> "In determining the issue in subparagraph (D) of paragraph (b) of this subsection, the court shall instruct the jury to answer the question 'no' if one or more of the jurors find there is any aspect of the defendant's character or background, or any circumstances of the offense, that one or more of the jurors believe would justify a sentence less than death."

Or Laws 1991, ch 885, § 2.[21]

Turning to the original version of ORS 163.150(1)(b)(D), the above-emphasized phrase, "[i]f constitutionally required," clarified that the requirement that a trial court instruct a jury respecting consideration of relevant

---

[21] As discussed earlier in this opinion, the legislature in 1997 amended the jury instruction set out in ORS 163.150(1)(c)(B) as follows:

> "The court shall instruct the jury to answer the question in paragraph (b)(D) of this subsection 'no' if, after considering *any aggravating evidence and any mitigating evidence* concerning any aspect of the defendant's character or background, or any circumstances of the offense *and any victim impact evidence as described in subsection (1)(a) of this section,* one or more of the jurors believe that the defendant should not receive a death sentence."

Or Laws 1997, ch 784, § 1 (emphasis added). That 1997 version of ORS 163.150(1)(c)(B) is essentially identical to the current version of the statute.

As can be seen, the 1997 Legislative Assembly added the terms "aggravating evidence," "mitigating evidence," and "victim impact evidence" to the jury instruction accompanying the fourth question. However, the substance of the original wording of that instruction—"any aspect of the defendant's character or background, or any circumstances of the offense"—remained unchanged after the 1997 amendment. As explained in the text below, that particular wording is drawn in its entirety from United States Supreme Court jurisprudence respecting mitigating evidence under the Eighth Amendment. That jurisprudence therefore informs our understanding of the parameters of that wording.

evidence admitted under that statutory provision hinged on whether a constitutional provision required consideration of the evidence. The case law construing ORS 163.150(1)(b)(D) clearly explains the constitutional source at issue, as well as the intended scope of relevant "mitigating evidence" under the statutory scheme in its current form, as discussed below.

In *State v. Stevens*, 319 Or 573, 580-82, 879 P2d 162 (1994), this court reviewed the legislative history of ORS 163.150(1)(b)(D), from its enactment in 1989 through its amendment in 1991. In short, the court explained that the legislature originally had enacted that statute in light of the United States Supreme Court's decision in *Penry v. Lynaugh*, 492 US 302, 328, 109 S Ct 2934, 106 L Ed 2d 256 (1989), *abrogated in part on other grounds by Atkins v. Virginia*, 536 US 304, 122 S Ct 2242, 153 L Ed 2d 335 (2002), which had invalidated a three-question statutory death-penalty scheme on the ground that it did not allow the jury to consider fully the effect of the defendant's mitigating evidence regarding his diminished mental capacity. *Stevens*, 319 Or at 580-81. More specifically, in *Penry*, the Court held that, under the Eighth Amendment, a jury "must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the crime." *Stevens*, 319 Or at 581 (quoting *Penry*, 492 US at 328). *See* 336 Or at 427 n 2 (setting out Eighth Amendment).

The court in *Stevens* further explained that, shortly after the legislature had enacted ORS 163.150(1)(b)(D) in 1989, this court held in *Wagner II*, 309 Or at 18-19, that that statute did not satisfy the Eighth Amendment directive set out in *Penry*. *Wagner II*, 309 Or at 18-19. Consequently, the legislature in 1991 amended ORS 163.150(1)(b)(D) to its present form (that is, "[w]hether the defendant should receive a death sentence") and enacted the corresponding jury instruction set out in ORS 163.150(1)(c)(B). *Stevens*, 319 Or at 581-82. The court in *Stevens* specifically noted that, in amending ORS 163.150(1)(b)(D) in 1991, the legislature intended to codify—and indeed precisely adopted—this court's proffered wording from *Wagner II*. *Stevens*, 319 Or at 582.

After reviewing the development of ORS 163.150(1)(b)(D) through its 1991 amendment, the legislative

history of that statute, the Supreme Court's decision in *Penry*, and this court's decision in *Wagner II*, this court in *Stevens* concluded:

> "The passage of the original fourth question after *Penry* and the modification of that question following *Wagner II* make it clear that *the legislature intended the scope of the statutory fourth question to be co-extensive with the scope of the fourth question held in Penry and Wagner II to satisfy the requirements of the Eighth Amendment to the Constitution of the United States.* Accordingly, cases dealing with the Eighth Amendment fourth question and with the evidence relevant to that question inform our inquiry as to the scope of the evidence that is relevant under the statute."

319 Or at 582-83 (emphasis added). *See also Guzek II*, 322 Or at 258 (citing *Stevens* for proposition that, in enacting fourth question, legislature was "attempting to bring Oregon's death penalty scheme in compliance with *Penry*"). The court in *Stevens* then went on to examine Supreme Court decisions that discussed the phrase "mitigating evidence relevant to a defendant's background and character or the circumstances of the crime," 319 Or at 583 (internal quotation marks omitted), as those decisions related to the evidentiary issue in *Stevens*.[22]

In sum, this court concluded in *Stevens* that, in using the phrase "any aspect of the defendant's character or background, or any circumstances of the offense" in the jury instruction set out in ORS 163.150(1)(c)(B), the legislature intended to limit the admission of "mitigating evidence" in penalty-phase proceedings so as to satisfy the Eighth Amendment. Specifically, the legislature intended to ensure the admissibility of such evidence that the Eighth Amendment *requires* that a penalty-phase jury consider. The remaining question, then, involves a determination whether the alibi evidence that defendant proffered at his third penalty-phase

---

[22] The issue in *Stevens* was whether testimony of the defendant's wife regarding the potential effect on defendant's daughter of imposition of the death penalty on defendant fell within the scope of "mitigating evidence relevant to the issue in [ORS 163.150(1)(b)(D)]." ORS 163.150(1)(a). The court ultimately concluded that the testimony qualified as "mitigating evidence" under the statutory scheme because it suggested something particular about the defendant's "character" or "background," as the Supreme Court had applied those terms in earlier cases. *Stevens*, 319 Or at 583-85.

proceeding—specifically, his mother's testimony—fell within that federal constitutional category. As explained below, the Supreme Court's Eighth Amendment jurisprudence suggests that defendant's alibi evidence is the type of evidence that a defendant is constitutionally entitled to introduce during the penalty phase for the jury's consideration.

We begin our discussion with the plurality decision in *Lockett v. Ohio*, 438 US 586, 98 S Ct 2954, 57 L Ed 2d 973 (1978), which was a precursor to *Penry*. The defendant in *Lockett* was charged with aggravated murder resulting from a robbery of a pawnshop. According to the state's evidence, the defendant had participated with others in the planning of the robbery; however, she had remained in the car outside the pawnshop during the robbery and ensuing murder of the pawnbroker. During the guilt phase, defense counsel initially had argued that the defendant had been unaware that a robbery had taken place; however, the defendant ultimately presented no evidence to rebut the state's case.[23] The jury convicted the defendant of aggravated murder in the course of a robbery. From the jury instructions quoted in the plurality's opinion, it appears that the jury found that the defendant intentionally had participated in the robbery and that the circumstances of the robbery allowed the jury further to find, by operation of state law, that the defendant had intended to kill the pawnbroker. 438 US at 589-93.

Various psychiatric and psychological reports then were prepared for a subsequent capital sentencing proceeding before a judge. Those reports, which contained, among other things, statements from a codefendant that the defendant had not participated in planning the robbery and had left the car to eat during the robbery, were admitted into evidence at sentencing. 438 US at 594, 594 n 2.

The applicable statutory scheme required the trial court to sentence the defendant to death unless it found, by a preponderance of the evidence, that one or more of three statutory mitigating factors applied, relating to the potential existence of duress, coercion, or provocation; the potential

---

[23] The defendant had attempted to call two witnesses in her behalf; however, they both invoked the Fifth Amendment and did not testify. The defendant similarly invoked the Fifth Amendment. 438 US at 592-93.

existence of psychosis or mental deficiency; and the potential role of the victim in the offense. Finding that none of those factors applied (particularly, the "psychosis or mental defect" factor), the trial court sentenced the defendant to death. 438 US at 593-94.

Before the Supreme Court, the defendant argued that the statutory scheme violated the Eighth Amendment. After reviewing its jurisprudence, a plurality of the Court stated:

> "* * * [W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case,[24] not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record *and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.*"

438 US at 604 (first emphasis in original; second emphasis added). The plurality added that "[n]othing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of [the] offense." *Id.* at 604 n 12.

The plurality then evaluated the statutory scheme at issue in light of the foregoing rule and concluded that, in permitting the consideration of only three specific mitigating factors, that scheme violated the Eighth Amendment. Specifically, under the scheme,

> "*[t]he absence of direct proof that the defendant intended to cause the death of the victim* is relevant for mitigating purposes only if it is determined that it sheds some light on one of the three statutory mitigating factors. *Similarly, consideration of a defendant's comparatively minor role in the offense,* or age, would generally not be permitted, as such, to affect the sentencing decision."

*Id.* at 608 (emphasis added).

---

[24] The court cited as a possible exception an intentional homicide committed by a prisoner or escapee serving a life sentence. *Lockett,* 438 US at 604 n 11.

In a companion case issued the same day, *Bell v. Ohio*, 438 US 637, 98 S Ct 2977, 57 L Ed 2d 1010 (1978), the same plurality vacated a death sentence imposed on another defendant under the same state statutory scheme. A jury had convicted the defendant in *Bell* of aggravated murder in the course of a kidnapping.[25] Among other things, the reports submitted at his sentencing hearing noted the defendant's claim that he had not been aware of the codefendant's actions when the codefendant had killed the victim and also noted that the defendant allegedly had been taking mescaline on the night of the crimes. Also at sentencing, the defendant testified that he had been under the influence of drugs on the night of the crimes and that he had gone along with the codefendant because he had been afraid. Finding that none of the statutory mitigating factors applied, the trial court sentenced the defendant to death. *Bell*, 438 US at 639-41.

Before the Supreme Court, the defendant argued that his youth, his cooperation with the police, and "the lack of proof that he had participated in the actual killing strongly supported an argument for a penalty less than death." *Id.* at 641-42. A plurality of the Court agreed that, under *Lockett*, the defendant's sentence violated the Eighth Amendment because the statutory scheme had precluded the trial court "from considering the particular circumstances of his crime and aspects of his character and record as mitigating factors." *Id.* at 642.

Almost four years after *Lockett* and *Bell*, a majority of the Supreme Court adopted and applied the rule set out in those cases, that is, that "the Eighth and Fourteenth Amendments require that the sentencer * * * not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 US 104, 110, 102 S Ct 869, 71 L Ed 2d 1 (1982) (quoting *Lockett*, 438 US at 604 (ellipsis in *Eddings*; original emphasis omitted). In adopting

---

[25] It appears that, similar to *Lockett*, the jury likely found the murder to have been intentional by operation of state law, stemming from its guilt finding on the kidnapping charge.

that rule, the court noted that, "[i]n some cases, such evidence properly may be given little weight." *Id.* at 115.

▉      *Lockett* and its progeny stand for the proposition that, under the Eighth Amendment, a court must allow a defendant to present at sentencing, and a sentencer must be able to consider, any evidence relevant to any circumstances of the offense that mitigates against imposition of the death penalty. As demonstrated by *Lockett* and *Bell*, that includes evidence that a defendant played an insignificant role in the offense or otherwise possessed a less culpable *mens rea*, notwithstanding an earlier guilt finding of intentional participation in capital murder. Further, the Court's statement in *Eddings*, 455 US at 110, that a sentencer is free to accord a defendant's proffered mitigating evidence little weight clarifies that evidence that is not particularly trustworthy still is admissible under the command of the Eighth Amendment if it is relevant to a defendant's character or record, or to the circumstances of the offense. *See also generally Sawyer v. Whitley*, 505 US 333, 342-43, 112 S Ct 2514, 120 L Ed 2d 269, *reh'g den*, 505 US 1244 (1992) (*Lockett* and its progeny hold that capital defendants permitted to introduce "wide variety of mitigating evidence").

The foregoing reading of *Lockett* and *Bell* generally supports the admission of defendant's alibi evidence, because that evidence concerned "circumstances of the offense" (*i.e.*, defendant's professed lack of involvement, notwithstanding his earlier murder convictions) that, if believed, would have mitigated against imposition of the death penalty. However, we acknowledge that the juries in *Lockett* and *Bell* appear to have based their respective guilty verdicts for capital murder on factual findings that the defendants actively had participated in the underlying felonies of aggravated robbery (*Lockett*) and aggravated kidnapping (*Bell*), which, by operation of state law, allowed the juries also to find the defendants guilty of capital murder. Such guilt-phase findings therefore would have left open the possibility that proffered sentencing-phase evidence that the defendants had not intended to kill the victims, or otherwise had played only peripheral parts in the underlying felonies (although with the requisite intent respecting those felonies), would mitigate against imposition of the death penalty, notwithstanding the

earlier capital murder convictions. Defendant in this case, by contrast, was convicted of the aggravated murders—defined in part as "intentionally" causing death, ORS 163.095; ORS 163.115(1)(a); ORS 163.005—of both victims. Defendant's alibi evidence was inconsistent with those convictions; by contrast, the mitigating evidence at issue in *Lockett* and *Bell* was consistent with the underlying convictions, because the defendants could have been convicted of capital crimes not-withstanding their lessened culpability respecting the capital murders.

However, the foregoing factual distinction between *Lockett* and *Bell*, on the one hand, and the case at bar, on the other, is of no consequence in light of the Supreme Court's decision in *Green v. Georgia*, 442 US 95, 99 S Ct 2150, 60 L Ed 2d 738 (1979), issued the year after *Lockett* and *Bell*. The defendant in *Green* had been convicted of murder, as had a codefendant. Unlike the defendants in *Lockett* and *Bell*, it appears that the defendant in *Green* had been convicted of the murder itself—that is, of the intentional killing of the vic-tim—rather than of more limited, intentional participation in an underlying capital felony.[26] At sentencing, the defen-dant sought to introduce testimony of a third person that the codefendant had stated to that person that the codefendant had killed the victim after sending the defendant on an errand. The defendant had not sought to introduce that tes-timony during the guilt phase of his trial. The trial court excluded the evidence on hearsay grounds, and the Georgia Supreme Court affirmed. 442 US 95-96; *Green v. State*, 242 Ga 261, 272-73, 249 SE2d 1, 9-10 (1978).[27]

---

[26] The Supreme Court's decision stated that the defendant had been indicted, with a codefendant, of rape and murder, and had been convicted separately of mur-der. 442 US 95. Likewise, the Georgia Supreme Court decision subject to review, as well as that court's decision following a new guilt-phase proceeding, both stated that the defendant had been convicted of murder, and the initial state court deci-sion also discussed evidence of an admission on the defendant's part that he per-sonally had killed the victim. *Green v. State*, 242 Ga 261, 261, 249 SE2d 1, 3-4 (1978); *Green v. State*, 246 Ga 598, 598, 272 SE2d 475, 479 (1980). No description of the facts or procedural history by either court suggests that, like the defendants in *Lockett* and *Bell*, the defendant in *Green* had been indicted and convicted of murder on any felony-murder or aid-and-abet theory of guilt.

[27] The Georgia Supreme Court surmised that the defendant had not introduced the disputed evidence during the guilt phase because that evidence would have demonstrated that the defendant "actively and knowingly [had] participated in the entire criminal enterprise[,] including the robbery, kidnapping, and rape of the

In a brief per curiam, eight-to-one decision, the Supreme Court reversed. The Court stated:

"Regardless of whether the proffered testimony comes within Georgia's hearsay rule, under the facts of this case its exclusion constituted a violation of the Due Process Clause of the Fourteenth Amendment. *The excluded testimony was highly relevant to a critical issue in the punishment phase of the trial, see Lockett * * *, 438 US * * * [at] 604-05 * * *, and substantial reasons existed to assume its reliability.*"[28]

*Id.* at 97 (emphasis added). Thus, in *Green*, the Supreme Court concluded that, under *Lockett*, the defendant's evidence that he had not participated in the murder was a relevant circumstance of the offense that the sentencer must consider, notwithstanding that the defendant already had been convicted of the victim's murder.

As can be seen, the facts of *Green* appear to be analogous to the facts at issue here. As in *Green*, defendant here already had been convicted of the murders of the victims, and, notwithstanding those earlier convictions, defendant sought to introduce evidence at his third penalty-phase proceeding—which he did not seek to introduce during the guilt phase—that, if believed, would have shown that he had not been present at the victims' home at the time of the murders. Applying the Court's reasoning in *Green*, we conclude that such evidence was "highly relevant to a critical issue" in the penalty phase, 442 US at 97, and therefore was required to be considered by the jury under the Eighth Amendment.[29]

---

victim," as well as leaving the victim with the armed codefendant (who had made murderous statements to the defendant), helping to dispose of the victim's body, and leaving the state with the victim's car, the murder weapon, and part of the robbery proceeds. *Green*, 242 Ga at 272, 249 SE2d at 9.

[28] The Court's reference to, and subsequent discussion of, the "reliability" of the hearsay statement pertained to the parameters of the constitutionally based exception to the hearsay rule discussed in *Chambers v. Mississippi*, 410 US 284, 302, 93 S Ct 1038, 35 L Ed 2d 297 (1973).

[29] The Supreme Court ultimately grounded its conclusion in *Green* in the Due Process Clause of the Fourteenth Amendment to the United States Constitution, in light of the Court's application of the exception to the hearsay rule established in *Chambers*, 410 US at 302. In reaching that conclusion, the Court emphasized the fact that, contrary to its objection to the evidence at issue in mitigation in *Green*, the state had introduced the hearsay evidence at issue in aggravation in the capital trial of the *Green* defendant's codefendant. In that connection, the Court concluded

It follows that that evidence also qualified as "mitigating evidence" under the statutory scheme set out in ORS 163.150(1)(a), (b)(D), and (c)(B). Accordingly, the trial court erred in excluding that evidence at defendant's third penalty-phase proceeding, and, if the state again pursues the death penalty on remand, and if defendant again offers his alibi evidence, that evidence shall be admissible.[30]

## V. CONCLUSION

As the state concedes, the trial court erred in refusing to instruct the jury respecting the true-life sentencing option, after defendant waived any *ex post facto* challenges to that option under Article I, section 21, of the Oregon Constitution and Article I, section 10, of the United States Constitution. In light of that error, we reverse defendant's death sentence and remand for resentencing.

---

that the defendant in *Green* unconstitutionally had been denied a fair trial. *Green*, 442 US at 97.

However, the fact that the Supreme Court ultimately relied on the Due Process Clause to reverse the defendant's conviction in *Green* does not lessen the import of the Court's citation to *Lockett* for the principle that the evidence at issue was "highly relevant" to a "critical issue" in the sentencing determination. *Green*, 442 US at 97. When read in full, the Court's reasoning in *Green* can be broken down into the following analytical conclusions: (1) the Eighth Amendment required that the jury not be precluded from considering the defendant's mitigating evidence respecting a circumstance of the offense—specifically, evidence that he was not present during the actual murder; (2) the evidence was supported by factors tending to establish its reliability; and (3) given that the evidence was relevant under the Eighth Amendment and sufficiently reliable, the *Chambers* hearsay exception applied. In short, notwithstanding its ultimate conclusion under the Due Process Clause, the Court's reliance on *Lockett* was illustrative of its view that mitigating evidence under the Eighth Amendment includes evidence of a less-than-significant role in the capital offense, including evidence that a defendant previously convicted of murder was not present during the capital offense. Again, the Court made that point in the context of a case in which neither that Court nor the state supreme court had suggested that the defendant had been convicted on anything less than a theory of direct liability for murder.

[30] We note that, in *Franklin v. Lynaugh*, 487 US 164, 172, 174, 108 S Ct 2320, 101 L Ed 2d 155, *reh'g den*, 487 US 1263 (1988), a plurality of the Supreme Court strongly suggested, and the concurrence would have held, that the Eighth Amendment does not require an *instruction* that a penalty-phase jury consider any *residual or lingering doubts* remaining from the guilt phase. *Id.* at 187-88 (O'Connor, J., concurring). However, nothing in that decision lessened the direction from *Lockett*, *Bell*, *Eddings*, and *Green* that the Eighth Amendment *does* require that a defendant be permitted to *introduce*, and a jury be able to consider, *mitigating evidence relevant to any circumstances of the offense*, such as evidence that would lessen the defendant's culpability in the offense. Simply stated, a "residual" or "lingering doubt[ ]" remaining from the guilt phase, *Franklin*, 487 US at 174, is qualitatively different from actual "evidence" proffered during the penalty phase.

We further conclude that the prohibition against *ex post facto* laws contained in Article I, section 21, of the Oregon Constitution precludes the admission of "any aggravating evidence" against defendant under the current versions of ORS 163.150(1)(a) and (c)(B) on remand. However, even if Article I, section 21, also would preclude the admission of victim-impact evidence against defendant under those statutory provisions, the victims' "right * * * to be heard" set out in Article I, section 42(1)(a), of the Oregon Constitution supersedes any protection afforded to defendant under Article I, section 21. Additionally, the *Ex Post Facto* Clause of Article I, section 10, of the United States Constitution does not preclude the admission of victim-impact evidence against defendant under the current versions of ORS 163.150(1)(a) and (c)(B), because the amendments to those statutory provisions did not lower the minimum quantum of evidence required to obtain a sentence of death.

Further, in any subsequent penalty-phase proceeding, if defendant offers evidence of inconsistent statements by state witnesses to impeach their testimony, then the trial court must determine whether that evidence has a nonhearsay purpose. If it does, then the evidence may not be excluded on the basis of the hearsay rule alone. Finally, under the "mitigating evidence" provisions of ORS 163.150(1) and the Eighth Amendment to the United States Constitution, as well as under the applicable provisions of ORS 163.150(1)(a) and ORS 138.012(2)(b) (relating to a capital defendant's "prior trial and sentencing proceeding" and "all evidence previously offered and received"), any alibi evidence that defendant proffers in mitigation shall be admissible.

We have reviewed the remaining assignments of error and have concluded that they are without merit or are unlikely to arise on remand. Further discussion of those assignments would not benefit the bench, bar, or public.

The sentence of death is vacated, and the case is remanded to the circuit court for further proceedings.

**DURHAM, J.**, concurring.

I concur in Justice Riggs's opinion for the court, which vacates the sentence of death and remands the case for further proceedings.

The opinion correctly answers several questions that are likely to arise on remand if the state elects, under ORS 138.012(2)(a)(B), to conduct a new sentencing proceeding before a new sentencing jury. The questions that the court addresses focus principally on the evidence that the parties may offer in such a proceeding on remand.

The court's opinion does not address another argument that defendant raises that, if sustained, would obviate the need for a new sentencing proceeding. Defendant urges this court to reconsider and overrule its decision in *State v. Wagner*, 309 Or 5, 786 P2d 93 (1990) (*Wagner II*). According to defendant, when these murders occurred in 1987, Oregon's 1985 death penalty-statute was in effect and is applicable to this case. Defendant argues that that statute contained no provision requiring the factfinder to consider any mitigating circumstances regarding the murders. For that reason, defendant asserts, Oregon's 1985 statute violated pertinent federal constitutional principles and does not authorize imposition of a sentence of death in this case. *See Penry v. Lynaugh*, 492 US 302, 109 S Ct 2934, 106 L Ed 2d 256 (1989) (holding that similar Texas statute did not authorize sentence of death, because it lacked provision requiring consideration of mitigation factors).

I previously have expressed the view that the court wrongly decided *Wagner II* and that the court should reconsider that decision. *State v. Montez*, 324 Or 343, 346-47 n 5, 927 P2d 64 (1996); *State v. Pinnell*, 319 Or 438, 449, 887 P2d 635 (1994) (Durham, J., dissenting). I adhere to that view. The reasoning that the court adopted in *Wagner II* is indefensible and warrants no deference under this court's doctrine of *stare decisis*.

*Wagner II*, however, is not the last word on this subject. Since this court issued that decision, the legislature has amended ORS 138.012(2)(b) and ORS 163.150(1)(c)(B) to

require the trial court to instruct the jury, in a sentencing proceeding on remand, to consider any mitigating circumstances offered in evidence, among other things. Defendant may argue that those legislative amendments occurred after the murders occurred, but that argument alone does not establish that the amendments are *ex post facto* laws or are inapplicable or invalid for some other reason.

The court is in no position to disregard the legislature's later enactments unless the parties' briefing demonstrates that the legislature has exceeded its authority or otherwise has failed to meet constitutional requirements. In regard to *Wagner II*, defendant must demonstrate not only that this court wrongly decided *Wagner II*, but also that the error entitles him to a different disposition notwithstanding the legislature's later attempts to fix the problem. The parties' briefing does not sufficiently address, and the court's opinion does not decide, that question.

I agree with the court's decision not to address whether the error in *Wagner II* requires a different result in this case. From this vantage point, the court cannot determine with certainty that the dispute over *Wagner II* is likely to arise on remand. If it does arise, then the parties should address in detail the issues discussed in this opinion.

I concur.

**GILLETTE, J.**, concurring in part and dissenting in part.

I join all of the majority opinion in this unfortunate case except for the majority's regrettable discussion and disposition of defendant's assignment of error respecting the trial court's refusal to permit him to present certain "alibi" evidence. As to that subject, and contrary to the majority, I believe that the trial court's ruling excluding that evidence was precisely correct. I therefore respectfully dissent from that part of the majority opinion.

One piece of context for the majority's analysis of the problem—and of mine—cannot be overemphasized. The jury in this case was empaneled to decide only whether this defendant should receive the death penalty; *the question whether defendant was personally, criminally responsible for the*

*deaths of the two victims had already been established by a
separate jury trial, and that verdict had been affirmed on
appeal. See State v. Guzek*, 310 Or 299, 304, 797 P2d 1031
(1990) (affirming defendant's convictions for two counts of
aggravated murder). For various reasons, defendant's sen-
tence of death for those two murders has twice been reversed,
and the present appeal is from the third jury verdict deter-
mining that defendant should receive the death penalty.

As the majority explains, 336 Or at 450, defendant in
this case proffered evidence from two relatives to the effect
that defendant could not have been one of the murderers,
because he was elsewhere at the time. That is, he offered evi-
dence that, in spite of the aforementioned jury verdict to the
contrary, he was innocent of the crimes.

Defendant offered that evidence as "mitigating evi-
dence" under ORS 163.150(1)(b)(D), which requires a court to
submit to a jury in a case in which the defendant has been
found guilty of aggravated murder the question "[w]hether
the defendant should receive a death sentence." A separate
part of ORS 163.150(1) directs the trial court to give a specific
instruction to the jury in connection with the foregoing ques-
tion. It provides, in part:

> "The court shall instruct the jury to answer the question
> in paragraph (b)(D) of this subsection 'no' if, after consider-
> ing any aggravating evidence *and any mitigating evidence
> concerning any aspect of the defendant's character or back-
> ground, or any circumstances of the offense* * * * one or more
> of the jurors believe that the defendant should not receive a
> death sentence."

ORS 163.150(1)(c)(B) (emphasis added). The issue in this
case is whether, under the emphasized wording of that sta-
tutorily required jury instruction, defendant was entitled to
have the jury consider the evidence that he proffered. The
majority says that he was. I disagree.

The majority first divides the proffered evidence into
two separate categories. 336 Or at 451. Respecting the tes-
timony of defendant's grandfather, defendant offered the
transcript of the grandfather's testimony from a previous
trial of the case. The trial court refused to admit it. As the
majority correctly notes, ORS 138.012(2)(b) provides that, in

a sentencing proceeding conducted after reversal of an earlier proceeding, a transcript of all testimony, exhibits, and other evidence properly admitted in the former proceedings is admissible in the later proceeding. Thus, the majority concludes, the trial court's contrary ruling respecting the grandfather's testimony was error. 336 Or at 451.

I disagree that the trial court erred, because it is not clear to me that the statute automatically makes admissible *all* evidence, whatever its subject matter, from prior trials. The statute provides, in part, that, in a new sentencing proceeding:

> "A transcript of all testimony and all exhibits and other evidence properly admitted in the prior trial and sentencing proceeding are admissible in the new sentencing proceeding. Either party may recall any witness who testified at the prior trial or sentencing proceeding and may present additional *relevant* evidence."

ORS 138.012(2)(b) (emphasis added). The question is not free from doubt, but I would read the legislature's use of the qualifying word, "relevant," in the final sentence of ORS 138.012(2)(b) as indicating the legislature's intention to limit the admissibility of any evidence in the later proceeding to "relevant" evidence. Certainly, and in any event, if the grandfather's testimony would not have been relevant to any issue properly left for the jury to decide—as I believe to be the case—defendant can claim no *prejudicial* error in denying admission of the transcript of the grandfather's testimony.[1]

The focus of the majority's analysis is the testimony of defendant's mother, which had not been offered previously and which, like that of the grandfather, would (if believed) be wholly exculpatory. The majority does an admirable job of tracing the lineage of the wording of ORS 163.150(1)(b)(D) and (c)(B). 336 Or at 452-57. That history establishes, as the majority acknowledges, that what the legislature intended to allow as "mitigating" evidence was precisely what the United States Supreme Court would require pursuant to the federal

---

[1] For some reason, the state did not, in its extensive briefing in this case, separately discuss either the grandfather's or the mother's testimony.

constitution; nothing more, nothing less. Thus, the true question in the case boils down to this: Would the United States Supreme Court, if faced with the question, hold that a defendant in the position of defendant here would be entitled, in a penalty-phase proceeding, to assert that he should receive a sentence less than death because, in fact, he is innocent of the underlying crime?

In my view, there is no clear binding authority respecting the issue. A majority of the Supreme Court never has dealt with the question. However, a four-judge plurality of that Court did address an analogous issue in 1988 in a way that is (in my view) so clear (and so clearly right) that I am content simply to adopt the plurality's view now:

> "At the outset, we note that this Court has never held that a capital defendant has a constitutional right to an instruction telling the jury to revisit the question of his identity as the murderer as a basis for mitigation. Petitioner suggests that our discussion of the 'residual doubt' question in *Lockhart v. McCree*, 476 US 162, 180-182, [106 S Ct 1758, 90 L Ed 2d 137] (1986), supports his position that he has such an entitlement. * * * But all that this aspect of the *Lockhart* opinion stands for is the simple truism that *where* 'States are willing to go to allow defendants to capitalize on "residual doubts," ' such doubts will inure to the defendant's benefit. *Lockhart, supra,* at 181. *Lockhart* did not endorse capital sentencing schemes which permit such use of 'residual doubts,' let alone suggest that capital defendants have a *right* to demand jury consideration of 'residual doubts' in the sentencing phase. Indeed, the *Lockhart* dissent recognized that there have been only a 'few times in which any legitimacy has been given' to the notion that a convicted capital defendant has a right to argue his innocence during the sentencing phase. 476 US, at 205-206 (Marshall, J., dissenting). The dissent also noted that this Court has not struck down the practice in some States of prohibiting the consideration of 'residual doubts' during the punishment trial. *Ibid.*"

*Franklin v. Lynaugh*, 487 US 164, 172-73, 108 S Ct 2320, 101 L Ed 2d 155 (1988) (White, J., plurality opinion) (emphasis in original) (footnote omitted). That is the line that this court should follow, unless and until the Supreme Court, forced to face the issue, tells us that we are wrong.

The majority argues that it has found a contrary holding in the Court's brief, eight-to-one per curiam decision in *Green v. Georgia*, 442 US 95, 99 S Ct 2150, 60 L Ed 2d 738 (1979), but I find it impossible to imagine how, nine years later, four members of the Court could say what they said in *Lynaugh*, if this court's majority correctly understands *Green*. In my view, as explained below, this court's majority has not correctly understood *Green*.

The majority explains that, in *Lockett v. Ohio*, 438 US 586, 98 S Ct 2954, 57 L Ed 2d 973 (1978), and *Bell v. Ohio*, 438 US 637, 98 S Ct 2977, 57 L Ed 2d 1010 (1978), a plurality of the Supreme Court held that the Eighth and Fourteenth Amendments require that a sentencing jury be allowed to consider, "*as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."[2] *Lockett*, 438 US at 604 (emphasis in original). The majority appears to recognize that, as interpreted in *Lockett* and *Bell*, "circumstances of the offense" relates to facts that would tend to reduce a defendant's relative moral culpability for the crime, such as evidence of the defendant's minor participation in the killing of the victim, for which he was held liable on an aiding-and-abetting theory. 336 Or at 460-41. On the basis of *Green*, however, the majority concludes that alibi evidence tending to prove that defendant did not participate *at all* in the crime is relevant to a "circumstance of the offense," as interpreted by the Supreme Court, and, therefore, such evidence must be admitted during the penalty phase pursuant to the Eighth Amendment. According to the majority, *Green* supports that conclusion, because that case involved the introduction of testimony that contradicted the jury's earlier finding of direct liability for the murder and because it includes the following sentence: "The excluded testimony was highly relevant to a critical issue in the punishment phase of the trial, *see* [*Lockett*, 438 US at 604-05] (plurality opinion); *id.*, at 613-616 (opinion of Blackmun, J.), and substantial reasons existed to assume its reliability." *Green*, 442 US at 97.

---

[2] The plurality holding of *Lockett* ripened into a majority holding of the Court in *Eddings v. Oklahoma*, 455 US 104, 102 S Ct 869, 71 L Ed 2d 1 (1982).

There are three problems with placing *Green* so prominently within the Court's Eighth Amendment-*Lockett* jurisprudence. First, I disagree with the conclusion that the defendant in *Green*, like defendant in this case, sought to introduce evidence that contradicted the jury's guilt-phase findings and would have led to an acquittal. Second, the citation to *Lockett* reflects nothing more than the Court's conclusion that the defendant sought to introduce evidence about his minor participation in the actual killing of the victim, which was precisely the type of evidence made relevant by both the plurality and concurring opinions in *Lockett*. Third, the circumstances surrounding *Green* and its actual holding minimize its significance as a useful precedent for this case.

I begin with the majority's first major premise, which is that "the defendant in *Green* had been convicted of the murder itself—that is, of the intentional killing of the victim—rather than of more limited, intentional participation in an underlying capital felony." 336 Or at 461. The Supreme Court's opinion in *Green* suggests otherwise. In the factual description of the case, the Court states that "[t]he evidence at trial tended to show that petitioner and Moore abducted Allen from the store where she was working alone and, *acting either in concert or separately*, raped and murdered her." *Green*, 442 US at 96 (emphasis added). The Court's disjunctive description indicates that the defendant in *Green* was tried for murder either as one of the killers or as a participant in the underlying felony, as was possible under the Georgia murder statute. *See Scott v. State*, 252 Ga 251, 252, 313 SE2d 87, 88 (1984) (explaining that, under Georgia Code Annotated 26-1101, a defendant may be convicted of felony murder when "acting in concert" with a codefendant in committing a crime and a death occurred). The Court's description also echoes in general the elements of felony murder—the defendant, or someone acting in concert with the defendant, caused the death of another person during the course of committing a felony. *See, e.g.*, Erwin S. Barbre, Annotation, *Criminal Liability Where Act of Killing Is Done by One Resisting Felony or Other Unlawful Act Committed by Defendant*, 56 ALR3d 239, 249 (1974) (discussing cases holding that "in order to convict a defendant under the felony-murder rule the act of killing must be that of defendant and

that to be his act, the act must be committed by defendant or *one acting in concert with him*") (emphasis added). Thus, the Court may have thought that the defendant in *Green* was convicted on a felony-murder theory.

That approach would make sense from the state's perspective in *Green*. The state had clear evidence of defendant's participation in the kidnapping and the acts taken in concert with his codefendant. Once the murder conviction was secured, the state then could argue—as it did during the penalty phase—that the defendant was directly involved in shooting the victim because she suffered two wounds, and the defendant should receive the death penalty for his participation in the killing. *Green*, 442 US at 96 n 2. That argument by the state would have been unnecessary if the guilt-phase jury—which also sat during the penalty phase—already had found that Green was directly responsible for the victim's death.

*Green* also cites *both* the *Lockett* plurality *and* Justice Blackmun's concurrence. *Green*, 442 US at 97 (citing *Lockett*, 438 US at 604-05; *id.* at 613-16 (Blackmun, J., concurring)). The Court's citation to Justice Blackmun's concurrence is revealing, because, in *Lockett*, Justice Blackmun took a narrower approach than the plurality. He would have held only that a state court may not sentence an aider-and-abettor to death without allowing the sentencer to consider the extent of that person's involvement, and degree of *mens rea*, in the commission of the homicide. *Lockett*, 438 US at 614. By citing Justice Blackmun's concurrence and its discussion of aiding-and-abetting liability, the Court reveals that the "critical issue" in *Green* is whether a defendant—who, along with a codefendant, has been found guilty of murder— may show that his *relative* culpability for the crime is minimal because he neither participated in the killing nor intended it to occur.

The majority asserts that, because neither the state lower courts nor the Supreme Court suggested otherwise, the defendant in *Green* must have been indicted and convicted for intentionally killing the victim. 336 Or at 461 n 26. I do not find that inference from silence persuasive. In my view, unlike defendant in this case, the Court did not view the

defendant in *Green* as attempting to challenge his liability for the crime. Rather, just as in *Lockett*, the defendant in *Green* attempted to reduce, but not eliminate, his relative culpability by arguing that he did not intend the killing to occur. Under that more limited reading, which I think accurately describes the Court's understanding of the facts before it, the majority's effort to place *Green* in the same factual posture as the present case fails.

I turn to my second disagreement with the majority's application of *Green*. To make *Green* work, the majority not only must find a factual similarity between that case and this case; the majority also must decide that, as a matter of law, *Green* concluded that the Eighth Amendment requires that, if offered, certain exculpatory evidence must be submitted at the penalty phase. To that end, the majority relies on the following sentence: "The excluded testimony was highly relevant to a critical issue in the punishment phase of the trial, *see* [*Lockett*, 438 US at 604-05] (plurality opinion); *id.*, at 613-616 (opinion of Blackmun, J.), and substantial reasons existed to assume its reliability." *Green*, 442 US at 97. The majority's reliance on that sentence for its view of *Green*'s legal conclusion is unavailing.

First, the quoted sentence does not identify the "critical issue" to which it refers. As explained above, the facts and procedural history of *Green* are sufficiently ambiguous to suggest that the Court viewed the excluded testimony as relevant because it showed that defendant was a minor participant in a crime for which he properly was held liable—again, an uncontroversial view after *Lockett*.

Moreover, *Green* does not mention the Eighth Amendment, and the citation to *Lockett* comes within the context of a discussion of the relevance and reliability of the proffered testimony. As I read the Court's opinion, *Green*'s citation to *Lockett* simply supports the claim that the evidence is logically relevant to the issues at the penalty phase. Stating that evidence is relevant to the critical issue of defendant's culpability is distinguishable, however, from holding that evidence must be admitted at the penalty phase under the Eighth Amendment. Yet the majority suggests that *Green* sweeps precisely that broadly. 336 Or at 462-63 n 29.

Finally, the majority purports to find an Eighth Amendment holding in *Green* on the basis of the particular factual circumstances of the case and the citation to *Lockett*. Answering the Eighth Amendment question, however, was unnecessary to the Court's disposition of the case. Once the Court concluded that the proffered hearsay testimony met the minimal requirements of relevance and reliability, it took the safer route and applied the established due process rule of *Chambers v. Mississippi*, 410 US 284, 302, 93 S Ct 1038, 35 L Ed 2d 297 (1973) ("[T]he hearsay rule may not be applied mechanistically to defeat the ends of justice."). The Court's approach left for another day the more controversial question of whether, and under what circumstances, the Eighth Amendment requires the admission of certain mitigating evidence at the penalty phase. As the majority notes, the Court reached that conclusion three years *after Green*, in *Eddings*, 455 US at 114.

In sum, the legal discussion in *Green* (such as there is) provides no persuasive support for the view that the Eighth Amendment requires certain alibi evidence to be admitted during the penalty phase.

As to my final disagreement with the majority's application of *Green*, I observe that the circumstances of *Green* also militate against the majority's interpretation of that case. The defendant in *Green* argued that he should have been allowed to offer in evidence a confession that his codefendant made to a third party, which indicated that the codefendant was solely responsible for the murder. According to the Court, under Georgia's evidence rules, the confession was admissible during the guilt phase of the codefendant's trial, and the state freely relied on it in winning a conviction. When it came time for the defendant to use the same confession during the penalty phase of his trial, however, the state argued that it was inadmissible hearsay. The trial court accepted that theory, and then the state expressly invited the penalty-phase jury to infer that the defendant was a direct participant in the killing. *Thus, the mechanistic application of the hearsay rule deprived the defendant of presenting not only effective evidence regarding his lack of culpability, but evidence that would counter an express argument that the state had made during the penalty phase.*

Faced with such a "heads we win, tails you lose" interpretation in a death-penalty case, the Court summarily granted *certiorari*, vacated the opinion below without argument, and issued a short, three-paragraph per curiam opinion that relied on *Chambers* to hold that the state's approach to the hearsay rule violated the Due Process Clause. The Court took pains to limit its opinion. The Court stated at the outset that, "under the facts of this case," the exclusion of the evidence at the penalty phase violated the Due Process Clause, not the Eighth Amendment. *Green*, 442 US at 97. The subsequent discussion focused on the reliability of the confession, and the Court particularly noted that the state had relied on the confession during the codefendant's earlier trial. Again calling attention to the "unique circumstances" of the case, the Court concluded by stating that "the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id.*

Those circumstances demonstrate to me that *Green* is a species of "shocks-the-conscience" opinion. The Court simply was not going to let the State of Georgia get away with that approach in a death-penalty case. Thus, I am not persuaded that *Green* resolves whether certain alibi evidence is relevant and must be admitted pursuant to the Eighth Amendment. That holding would have been much more controversial and, for the Court's purposes in *Green*, was unnecessary.

Outside of its troubling reliance on *Green*, the majority faces an additional problem: Supreme Court cases discussing "residual doubt" arguments strongly suggest that alibi evidence is not relevant to a "circumstance of the offense" and, therefore, the Eight Amendment does not require its admission.

In *Lockhart v. McCree*, 476 US 162, 106 S Ct 1758, 90 L Ed 2d 137 (1986), the Court held that it was constitutionally permissible to exclude jurors who objected to imposing the death penalty prior to the guilt-phase of defendant's trial. To support that holding, Justice Rehnquist cited capital defendants' interest in having a unitary jury to which they could argue "residual doubt." *Id.* at 181. In dissent, Justice

Marshall disparaged the Court's concern with the defendant's ability to argue residual doubt. He stated that "this case will stand as one of the few times in which any legitimacy has been given to the power of a convicted capital defendant facing the possibility of a death sentence to argue as a mitigating factor the chance that he might be innocent," and he further noted that the Court had denied *certiorari* in state cases that had refused to allow defendants to make residual doubt arguments during capital sentencing proceedings. *Id.* at 205-06 (Marshall, J., dissenting). Justice Marshall (who was no advocate of the death penalty) did not even cite *Green*, which he certainly should have done, if that case stood for the proposition for which the majority now cites it. More fundamentally, as Justice Marshall's dissent makes clear, it is difficult to see how a court that was reluctant to give any legitimacy to capital defendants' residual doubt arguments as of 1986 could have concluded seven years earlier that the Eighth Amendment required evidence intended to raise residual doubts to be admitted at the penalty phase.

As I have noted, *Franklin* confirms that impression. In *Franklin*, the plurality suggested in the strongest terms that a defendant had no constitutional right to argue, during the penalty phase, that the defendant's life should be spared because there was a possibility that he was innocent:

> "At the outset, we note that this Court has never held that a capital defendant has a constitutional right to an instruction telling the jury to revisit the question of his identity as the murderer as a basis for mitigation. Petitioner suggests that our discussion of the 'residual doubt' question in [*Lockhart*] supports his position that he has such an entitlement. * * * But all that this aspect of the *Lockhart* opinion stands for is the simple truism that *where* 'States are willing to go to allow defendants to capitalize on "residual doubts," such doubts will inure to the defendant's benefit.' *Lockhart* did not endorse capital sentencing schemes which permit such use of 'residual doubts,' let alone suggest that capital defendants have a *right* to demand jury consideration of 'residual doubts' in the sentencing phase. Indeed, the *Lockhart* dissent recognized that there have been only a 'few times in which any legitimacy has been given' to the notion that a convicted capital defendant has a right to argue his innocence during the sentencing phase. The dissent also noted that this Court has not

struck down the practice in some States of prohibiting the consideration of 'residual doubts' during the punishment trial.

"Our edict that, in a capital case, ' "the sentencer * * * [may] not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense," ' in no way mandates reconsideration by capital juries, in the sentencing phase, of their 'residual doubts' over a defendant's guilt. Such lingering doubts are not over any aspect of petitioner's 'character,' 'record,' or a 'circumstance of the offense.' This Court's prior decisions, as we understand them, fail to recognize a constitutional right to have such doubts considered as a mitigating factor."

*Franklin*, 487 US at 172-74 (footnotes and citations omitted) (emphasis in original).

Justice O'Connor would have reached the constitutional issue directly and precluded any consideration of residual doubt as a mitigating factor. *Id.* at 187 (O'Connor, J., concurring) ("Our cases do not support the proposition that a defendant who has been found to be guilty of a capital crime beyond a reasonable doubt has a constitutional right to reconsideration by the sentencing body of lingering doubts about his guilt.").

I acknowledge that *Franklin* and *Lockhart* do not dictate the outcome here. *Lockhart*'s discussion is *dicta*, and a strict view of *Franklin*'s actual holding is that a defendant does not have a constitutional right to a *jury instruction* specifically calling attention to any lingering doubts about defendant's guilt. Neither case delineates the scope of *evidence* that a jury must be allowed to consider at the penalty phase.

Nevertheless, *Franklin* and *Lockhart* shed light on the Court's view of whether evidence suggesting that defendant may be innocent is relevant mitigating evidence under its interpretation of *Lockett* and its progeny. *Franklin* suggests that, just as residual doubt is not a constitutionally mandated mitigating factor that a jury must be allowed to consider, the Court also would hold that evidence intended to raise residual doubts about the defendant's guilt is not relevant to any constitutionally mandated mitigating factor. In

other words, given that the Court has allowed states to bar residual doubt *arguments*, it appears to follow ineluctably that, consistent with the Eighth Amendment, the Court would allow states to exclude *evidence* that is relevant only because it would bolster those arguments—that is, evidence intended only to challenge the accuracy of the underlying guilty verdict.

I therefore disagree with the majority's attempt to minimize the significance of *Franklin*. 336 Or at 463 n 30. *Franklin* is not simply a jury instruction case, as suggested by the majority. Rather, by discussing the scope of what constitutes a "circumstance of the offense," a majority of the Court necessarily communicated its view regarding the relevance under the Eighth Amendment of evidence intended to raise doubts about the accuracy of the guilty verdict. Because it suggests that such evidence is not "relevant mitigating evidence" as understood by the Court, *Franklin* cannot be dismissed so easily.

Other than that footnote, the majority does not address the concept of residual doubt. As I understand its view, the majority today holds that, as a matter of federal constitutional law, defendant's alibi evidence must be admitted as relevant to the mitigating factor of "circumstances of the offense," but the opinion need not and does not decide that the Eighth Amendment requires a jury to consider, or a defendant to have the opportunity to raise, any residual doubts about the defendant's guilt at the penalty phase. I do not share that view of either the correctness or scope of the majority's holding.

In order to be admitted, the defendant's alibi evidence must be "relevant mitigating evidence."[3] *Eddings*, 455 US at 114. In my view, the alibi evidence in this case is "relevant" and "mitigating" only in the sense that it challenges the accuracy of the underlying guilty verdict. It is intended to create or play upon any lingering doubts that the jury might have about the evidence that was used to convict the defendant. The alibi evidence does not describe the reason that

---

[3] As noted, the majority correctly holds that the scope of mitigating evidence relevant to the fourth question is coextensive with what is required to be considered under the Eighth Amendment.

defendant committed the offense, his conduct during the offense, his relative participation in the offense, or any other fact or circumstance regarding the offense itself that would reduce his moral responsibility. In fact, the proposed testimony quite literally does not say anything about *defendant's* offense at all.[4] *See Lockett*, 438 US at 604 n 12 (stating that a court may exclude, as irrelevant, "evidence not bearing on the defendant's character, prior record, or the circumstances of *his offense*") (emphasis added); *see also Blystone v. Pennsylvania*, 494 US 299, 304, 110 S Ct 1078, 108 L Ed 2d 255 (1990) ("[The death penalty in Pennsylvania] is imposed only after a determination that the aggravating circumstances outweigh the mitigating circumstances present in *the particular crime committed by the particular defendant*, or that there are no such mitigating circumstances. This is sufficient under *Lockett* and *Penry*.") (emphasis added). Rather, the alibi evidence's only relationship to the offense is temporal, and its relevance is only to establish that, in fact, defendant committed no offense at all.

The proposed testimony, therefore, is distinguishable from the evidence offered in *Lockett*, *Bell*, and *Green*. In those cases, the evidence concerned facts about the commission of the crime. *See, e.g.*, *Bell*, 438 US at 642 (holding that the Eighth Amendment required consideration of *"the particular circumstances of [defendant's] crime* and aspects of his character and record as mitigating factors" (emphasis added)); *see also Woodson v. North Carolina*, 428 US 280, 304, 96 S Ct 2978, 49 L Ed 2d 944 (1976) (stating that "circumstances of the *particular offense*" are "a constitutionally indispensable part of the process of inflicting the penalty of death" (emphasis added)). As those cases demonstrate, the purpose of requiring consideration of the "circumstances of the offense" is to allow the jury to decide whether the relative heinousness of the defendant's crime merits the death penalty.

In the present case, the alibi evidence is not related to any mitigating fact that informs the jury's consideration of

---

[4] Indeed, it is conceivable that, after this opinion, scientific evidence challenging the accuracy of eyewitness testimony or fingerprint evidence admitted during the guilt phase could be considered relevant to a "circumstance of the offense."

the severity of the crime. Rather, the evidence is a naked collateral attack on the sufficiency of the evidence supporting defendant's conviction. Regardless of the merits or effectiveness of that approach, *Franklin* strongly suggests that the state does not violate the Eighth Amendment if, during the penalty phase, it prohibits arguments or evidence intended to demonstrate that defendant is, in fact, innocent.

This defendant has been adjudged guilty of the two murders in question. Whatever the concept of "any aspect of the defendant's character or background, or * * * circumstance of the offense" may encompass, I cannot in reason believe that the Supreme Court, when faced with the issue directly, would hold that it encompasses revisiting the issue of guilt or innocence of the underlying offense.[5] The majority's contrary conclusion is wrong.

I respectfully dissent.

Carson, C. J., joins in this separate opinion.

---

[5] The foregoing point is made even more forcefully when one considers that revisiting the issue of guilt or innocence *is* permitted in specified circumstances, such as (1) the discovery of new evidence (if that is what happens) (ORS 136.535; ORCP 64 B(4)); (2) post-conviction proceedings, where it is alleged that counsel failed to perform adequately and, had counsel done so, evidence of innocence would have been discovered (ORS 138.510 to 138.686); or (3) executive clemency or pardon.